**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE APPLICATION OF QATAR NATIONAL BANK (Q.P.S.C.) AND QATAR CHARITY FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:24-mc-00035-LLA |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' *EX PARTE*
APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR
<u>USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782</u>**

### TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................. 3

I.    Respondent's Invocation of the Confidentiality Order Is a Red Herring. ......................... 3

    A.    The Confidentiality Order Did Not Immunize from Future Discovery Information About the Creation and Distribution of the Forged Record............... 3

    B.    Respondent's Reliance on "Collateral Estoppel" with Respect to the Confidentiality Order Is Likewise Misplaced. ....................................................... 8

II.    Petitioners' Requested Discovery Is Not Barred by the Work Product Doctrine. ............ 10

III.    Notwithstanding Respondent's Mischaracterizations, the Application Satisfies Both the Statutory Requirements and Discretionary Factors Under Section 1782........... 13

IV.    Respondent's Transfer Request Is at Odds with Both the Law and the Facts. ................. 20

    A.    Respondent Has Not Satisfied Its Burden to Show That the Application Could "Have Been Brought" in the Southern District of Florida. ......................... 21

    B.    Respondent Also Has Not Satisfied Its Burden to Show That the Southern District of Florida Would Be More "Convenient" for the "Parties and Witnesses" and That Transfer Would Be in the "Interest of Justice." ................. 22

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Arida, LLC,*
No. 19-mc-522 (PKC), 2020 WL 7496355 (S.D.N.Y. Dec. 21, 2020) ..................................7

*Brodie v. Jackson,*
No. 11-cv-1769 (BJR), 2014 WL 11813594 (D.D.C. July 7, 2014)......................................10

*In re C5 Cap. Ltd.,*
No. 1:24-mc-10 (TNM), 2024 WL 1701650 (D.D.C. Apr. 18, 2024)..............................15, 17

*Connors v. Tanoma Mining Co.,*
953 F.2d 682 (D.C. Cir. 1992) ..............................................................................................9

*In re Deposito Centralizado de Compensacion y Liquidacion de Valores Decevale, S.A.,*
No. 20-mc-25212, 2021 WL 2323226 (S.D. Fla. June 1, 2021)...............................................21

*Drummond Co. v. Conrad & Scherer, LLP,*
885 F.3d 1324 (11th Cir. 2018) ...........................................................................................13

*Euromepa, S.A. v. R. Esmerian, Inc.,*
51 F. 3rd 1095 (2d Cir. 1995) ..............................................................................................16

*FMC Corp. v. EPA,*
557 F. Supp. 2d 105 (D.D.C. 2008)......................................................................................21

*Foote v. Chu,*
858 F. Supp. 2d 116 (D.D.C. 2012) ......................................................................................24

*Henkin v. Qatar Charity,*
No. 21-cv-5716, 2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023).............................................20

*In re Harmonic, Inc. Sec. Litig.,*
245 F.R.D. 424 (N.D. Cal. 2007)..........................................................................................13

*In re Hulley Enters.,*
358 F. Supp. 3d 331 (S.D.N.Y. 2019), *aff'd*, 400 F. Supp. 3d 62..........................................19

*In re Inmobiliaria Tova, S.A.,*
No. 20-mc-24981, 2021 WL 925517 (S.D. Fla. Mar. 10, 2021) ............................................22

*Intel Corp. v. Advanced Micro Devices, Inc.,*
542 U.S. 241 (2004).................................................................................... *passim*

*Mauermann v. Cooper Tire & Rubber Co.*,
  No. 15-cv-14183, 2015 WL 12516630 (S.D. Fla. Sept. 3, 2015) ...............................................4

*In re Miya Water Projects Netherlands, B.V.*,
  No. 1:23-mc-43, 2023 WL 6294001 (D.D.C. Sept. 27, 2023) ................................................14

*In re Pishevar*,
  439 F. Supp. 3d 290 (S.D.N.Y. 2020) ...............................................................................19

*In re Pishevar*,
  No. 119-mc-00503 (JGK) (SDA), 2020 WL 8299764 (S.D.N.Y. Oct. 3, 2020) .....7, 15, 16, 19

*In re Pishevar*,
  No. 21-mc-105, 2023 WL 2072454 (D.D.C. Feb. 17, 2023) ......................................15, 16, 17

*Przewozman v. Qatar Charity*,
  No. 20-cv-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 16, 2023) ...........................................20

*Republic of Gambia v. Facebook, Inc.*,
  75 F. Supp. 3d 8 (D.D.C. 2021) .........................................................................................19

*In re Rigby*,
  No. 13-cv-271, 2013 WL 622235 (S.D. Cal. Feb. 19, 2013) .................................................16

*Robinson v. Eli Lilly & Co.*,
  535 F. Supp. 2d 49 (D.D.C. 2008) ................................................................................20, 21

*Savignac v. Jones Day*,
  586 F. Supp. 3d 16 (D.D.C. 2022) ............................................................................11, 12, 13

*Shire Dev. LLC v. Mylan Pharms., Inc.*,
  No. 8:12-cv-1190-T-30AEP, 2013 WL 6858319 (M.D. Fla. Dec. 30, 2013) ...........................8

*Smith v. Yeager*,
  234 F. Supp. 3d 50 (D.D.C. 2017) .....................................................................................20

*Sorenson Commc'ns, Inc. v. F.C.C.*,
  765 F.3d 37 (D.C. Cir. 2014) ...............................................................................................9

*Sotloff v. Qatar Charity*,
  No. 22-cv-80726, 2023 WL 6471413 (S.D. Fla. Sep. 28, 2023) ...........................................20

*In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*,
  439 F.3d 740 (D.C. Cir. 2006) ..............................................................................................9

*Taub v. Marchesi di Barolo S.P.A.*,
  No. 09-cv-0599 (ADS) (ETB), 2009 WL 10708937 (E.D.N.Y. Dec. 3, 2009) .......................4

*Tucker v. Ohtsu Tire & Rubber Co.*,
    191 F.R.D. 495 (D. Md. 2000) ......................................................................................4

*Tufts v. Hay*,
    977 F.3d 1204 (11th Cir. 2020) ..................................................................................22

*U.S. Dominion, Inc. v. Herring Networks, Inc.*,
    639 F. Supp. 3d 143 (D.D.C. 2022) .......................................................................24, 25

*United States v. All Assets Held at Bank Julius Baer & Co.*,
    270 F. Supp. 3d 220 (D.D.C. 2017) .......................................................................10, 11

*In re Veiga*,
    746 F. Supp. 2d 8 (D.D.C. 2010) ...............................................................................17

*In re Vitamins Antitrust Litig.*,
    263 F. Supp. 2d 67 (D.D.C. 2003) ..............................................................................23

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*,
    771 F. Supp. 2d 42 (D.D.C. 2011) .....................................................................23, 24, 25

## STATUTES

28 U.S.C. § 1404(a) .....................................................................................................20, 21

28 U.S.C. § 1782 ......................................................................................................... *passim*

## OTHER AUTHORITIES

18 James W. Moore, *et al.*, *Moore's Federal Practice* § 132.02[2][3] (3d ed. 2008) ....................9

# INTRODUCTION[1]

The Perles Law Firm's ("Respondent's") entire Opposition to Petitioners' Section 1782 Application is premised on the mischaracterization that Petitioners seek discovery about "individuals who signed the Transfer Record as 'witnesses' to al Salim's alleged receipt of the $800,000 in cash," Opp. at 2, as though the Forged Record were an authentic document and any names on it were of actual individuals who truly witnessed something.  In other words, Respondent's Opposition seeks to continue the charade of treating the Forged Record as though it were genuine, rather than as the brazen, defamatory forgery that Petitioners have proved it to be. The document has numerous, incontrovertible indicia of fraud, the most egregious of which are listing a SWIFT code that did not come into existence until years after the transfer it purportedly records and the repeated misspelling, in Turkish, of the Turkish word for "bank" in what purports to be a form Turkish bank document.  It is, in short, a work of fiction.  Petitioners are not interested in learning about any fictitious characters who might appear in the document, but rather seek to identify the real persons who were its authors and producers—the individuals who masterminded and carried out the fraudulent and defamatory scheme against Petitioners by creating the Forged Record and employing it against them.

The fact that Judge Middlebrooks' confidentiality order in the Sotloff Action (the "Confidentiality Order") allowed Respondent to unilaterally redact certain information that Respondent was, at the time, representing to Judge Middlebrooks as genuine does not in any way restrict this Court's ability to order discovery regarding the *source* of the Forged Record itself, which was never made subject to any confidentiality constraint.  Numerous courts have rejected

---

[1] Petitioners incorporate and use the defined terms set forth in the Application ("Appl."). *See* ECF No. 1.

the suggestion that redaction of a document in one proceeding somehow immunizes the facts underlying the redaction[2] from being the subject of discovery in other proceedings in the same or other jurisdictions.  Moreover, the bases for Petitioners' requests for information are derived only from the *non-confidential* version of the Forged Record that was publicly filed in court, with Respondent's consent; the redacted information, which is presumably as inauthentic as the remainder of the Forged Record, was not essential to the formulation of these limited requests, which are entirely independent of the information Respondent unilaterally redacted from the document.  The Confidentiality Order is, thus, a red herring.

Respondent's repeated citation to statements about the potential need for confidentiality made by Judge Middlebrooks *in reliance upon* the Forged Record are likewise entirely misplaced. After subsequently learning the truth about the document, including its numerous indicia of fraud, Judge Middlebrooks *vacated* his earlier order denying dismissal of the Sotloff Action and granted the parties' *joint* motion to dismiss that Action with prejudice.  Respondent cannot rely on the product of the fraudulent scheme—Judge Middlebrooks' initial rulings in reliance on the Forged Record—to defeat discovery into who conceived and implemented the fraud in the first place.  If, despite its concession that it cannot authenticate the Forged Record, Respondent now wishes to argue to this Court that the source of the Forged Record nonetheless deserves some measure of confidentiality—which Respondent has not established—Respondent needs to file a motion for a protective order with this Court, which this Court is more than capable of resolving after hearing from both parties to this Application.

---

[2] Respondent merely hints, without actually saying, that there may be some overlap between the information Petitioners seek by way of subpoena and the names fictitiously added to the Forged Record as supposed "witnesses" to a transaction that never occurred. *See* Opp. at 3, 10.  As demonstrated herein, even if one assumes some measure of overlap between the two, that overlap is entirely irrelevant to the merits of this Application.

Beyond the attempt at misdirection regarding Judge Middlebrooks' Confidentiality Order, Respondent offers no reasoned basis to oppose the Application. The Application amply satisfies both the statutory and discretionary standards under Section 1782. Petitioners seek limited discovery from Respondent, a law firm located in Washington, D.C., to identify the Forgers, in order to initiate civil and criminal proceedings in France *at least*, and potentially other jurisdictions, against the Forgers (and only the Forgers), based on the specific causes of actions laid out by French counsel retained by QNB. The Application thus falls squarely within the scope of Section 1782, and this Court should grant it.

## ARGUMENT

## I.    Respondent's Invocation of the Confidentiality Order Is a Red Herring.

### A.    The Confidentiality Order Did Not Immunize from Future Discovery Information About the Creation and Distribution of the Forged Record.

The cornerstone of Respondent's Opposition—that the Confidentiality Order bars the disclosure of the information requested in the Application—is based on the faulty premise that unilateral redaction of a *document* like the Forged Record in one proceeding (based, in this case, on misrepresentations about the document's authenticity) somehow *immunizes all facts about* the document, such as the circumstances of the document's forgery, from discovery in any court or jurisdiction in perpetuity. Not surprisingly, Respondent provides no authority for that astonishing assertion, and there is none. (If there were, many companies under government investigation would be sorely tempted to first produce their internal records under a protective order in private litigation.) Notably, the very terms of the Confidentiality Order belie Respondent's characterization. The Confidentiality Order makes clear that it "does not confer blanket protections on all disclosures or responses to discovery," but instead "extends only to the limited information or items that are entitled to confidential treatment under the applicable legal

principles." Serio Decl. Ex. A ¶ 1.  Indeed, Section 8 of the Confidentiality Order, titled "Protected Material Subpoenaed or Ordered Produced in Other Litigation," expressly contemplates that information designated Attorneys' Eyes Only ("AEO") in the Sotloff Action might also be subpoenaed and required to be produced in another proceeding.  *Id.* ¶ 8.

Courts that have considered arguments similar to Respondent's have rejected them.  As one judge in the Southern District of Florida has explained, in rejecting the argument that producing a document in one suit under a "confidentiality order precludes the use of its discovery in all other cases," "[j]ust because a document was produced in a prior litigation does not mean it never can be used again in any later similar litigation."  *Mauermann v. Cooper Tire & Rubber Co.*, No. 15-cv-14183, 2015 WL 12516630, at *5 (S.D. Fla. Sept. 3, 2015) (granting motion to compel discovery).  This is especially true when the "scope of the Order is limited to protecting [Respondent] with respect to documents which it designated as confidential and produced during discovery" and where "the obligations imposed by it are similarly one sided."  *Tucker v. Ohtsu Tire & Rubber Co.*, 191 F.R.D. 495, 498, 500 (D. Md. 2000) (granting motion to compel in part while acknowledging "the absurd tenet that a party can avoid discovery in one case merely because it disclosed the same material to an adversary bound by a protective order in another case" (quoting *Carter-Wallace Inc. v. Hartz Mountain Indus.*, 92 F.R.D. 67 (S.D.N.Y.1981))).  The "mere fact that information with respect to certain areas of discovery is turned over pursuant to the terms of a confidentiality order, does not preclude that area from independent investigation by opposing counsel, independent of that confidential source."  *Taub v. Marchesi di Barolo S.P.A.*, No. 09-cv-0599 (ADS) (ETB), 2009 WL 10708937, at *2 (E.D.N.Y. Dec. 3, 2009).

The appropriateness of the discovery sought by this Application is even more obvious than what was approved in *Mauermann*, *Tucker*, and *Taub*.  Here, Petitioners are *not* seeking discovery of any information that Respondent unilaterally redacted from the Forged Record (based on the

4

representation—since proven wrong—that the information was authentic). Respondent characterizes the information that remains redacted as the names of "individuals who signed the Transfer Record as 'witnesses' to al Salim's alleged receipt of the $800,000 in cash," Opp. at 2, but Petitioners are not seeking any information about the made-up scribblings on what has since been revealed to be a forged document—a document that could not possibly have existed at the time it was purportedly created and "witnessed," and which Respondent unsurprisingly cannot "authenticate"—as though those notations represented reality. Rather, Petitioners seek information about the *real* individuals who participated in, or were responsible for, fabricating and disseminating the Forged Record as part of an outrageous, defamatory fraudulent scheme.

Respondent coyly hints, without actually admitting, that there may be some overlap between (1) the identities of those with knowledge of the Forged Record, which information Petitioners seek for use in a foreign proceeding, and (2) the names of purported "witnesses" identified in the Forged Record. Opp. at 3, 10; Perles Decl. ¶ 13 ("*If* one or more of the witnesses identified in the redacted portion of the Transfer in fact was the Anonymous Source . . . ." (emphasis added)). But even if that were so, this would simply be a coincidence, however clumsy, in the execution of the fraud. Petitioners seek discovery only of the *actual* persons responsible for the document, regardless of any overlap with the redacted fictional information. A perpetrator of a fraud cannot hide his identity by shielding his name under a confidentiality order as a fictitious "witness" to a non-existent bank transaction falsely represented in a forged document. Moreover, Petitioners' discovery requests are based entirely on the non-confidential version of the Forged Record that Respondent agreed to file publicly, which is the version of the document that betrayed its fraudulent nature by its numerous errors and inconsistencies. Petitioners' Application is therefore entirely independent of any information that may remain under confidentiality protection and would be the same even if no such information existed.

5

Respondent's reliance on comments in Judge Middlebrooks' separate order entering the Confidentiality Order (the "Entry Order") regarding potential security concerns for those putative "witnesses" is even more off-base.  Respondent fails to mention that Judge Middlebrooks' remark that the Sotloff Plaintiffs' "concern [regarding security] is not unfounded" was explicitly premised on the court's earlier order denying Petitioners' motions to dismiss *based on* the Forged Record, which order was *ultimately vacated in response to incontrovertible evidence that the document was forged*.  *See* Serio Decl., Ex. B at 3; Hallward-Driemeier Decl., Ex. 10.  Respondent also conveniently ignores Judge Middlebrooks' language in the Entry Order that, "*[w]ithout knowing more* about a particular document or set of documents, it is *nearly impossible to properly weigh the security concerns* at issue." Serio Decl., Ex. B at 3 (emphases added).  Petitioners' subsequent identification of numerous, incontrovertible indicia of fraud in the Forged Record plainly constitutes "knowing more."  Indeed, precisely because of Petitioners' irrefutable evidence that the document is a forgery, Respondent ultimately agreed that the document (which Respondent initially tried to withhold from Petitioners and produced only after being so ordered by the court) should be *publicly filed*, with limited redactions, as an exhibit to the Sotloff parties' joint motion to vacate and dismiss the Sotloff Action with prejudice.  In other words, the Confidentiality Order, and Judge Middlebrooks' comments when entering it, took place at a time when the Court (based on Respondent's representations) was operating under the mistaken assumption that the Forged Record (like any document brought before a court) was *not* a forgery, but a genuine record documenting an actual banking transaction.  When Judge Middlebrooks subsequently learned the truth, he took prompt remedial action.  Accordingly, Respondent's reliance on statements by Judge Middlebrooks—when he was laboring under the false impression that the Forged Record was authentic—is misplaced.

To the extent Respondent still contends that there exist "confidentiality" concerns related to producing the information Petitioners seek, *see* Opp. at 28, the solution lies not in denying the Application or resorting to the earlier Confidentiality Order, entered under different circumstances and based on inaccurate assumptions.   Rather, Respondent must move in this Court and substantiate its purported need for a protective order concerning the information Petitioners seek. In *Intel*, on which Respondent relies, the Supreme Court stated that the remedy for any concerns about confidentiality is *not* outright denial of a 1782 application, but instead "consideration of 'appropriate measures, if needed, to protect the confidentiality of materials.'"   *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 265 (2004) (quoting *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998)).   Because Judge Middlebrooks' Confidentiality Order obviously did not address the discovery sought here—the identities and circumstances related to the production and use of the Forged Record as part of a fraudulent scheme—the appropriate procedure is for Respondent to move this Court for a protective order, specifying and substantiating any confidentiality concerns Respondent purportedly still has notwithstanding its concession in *Sotloff* that it cannot authenticate the Forged Record.   *See, e.g.*, *In re Arida, LLC*, No. 19-mc-522 (PKC), 2020 WL 7496355, at *7 (S.D.N.Y. Dec. 21, 2020) ("If there is an identifiable and avoidable risk that evidence sought in a section 1782 application may be used for improper purposes, a district court may enter a protective order to limit its use."); *see also In re Pishevar*, No. 119-mc-00503 (JGK) (SDA), 2020 WL 8299764, at *5 & n.3 (S.D.N.Y. Oct. 3, 2020) (granting petitioner's Section 1782 application and ordering respondent to "disclose to Petitioner the name and location of his Confidential Source" while entering a "confidentiality order to protect the identity of the . . . Source").

That is, in fact, what the Confidentiality Order, upon which Respondent seeks to rely, itself contemplates.  "In making a determination of whether material designated as confidential pursuant

to another court's confidentiality order should be produced in another matter, the first inquiry should be whether the prior confidentiality order intends to prohibit the discovery of the protected materials in other suits."  *Shire Dev. LLC v. Mylan Pharms., Inc.*, No. 8:12-cv-1190-T-30AEP, 2013 WL 6858319, at *2 (M.D. Fla. Dec. 30, 2013) (finding that the relevant "courts did not intend to limit another court's ability to evaluate whether the information protected by the orders in those cases should be subject to disclosure in another case").  Section 8 of the Confidentiality Order, titled "Protected Material Subpoenaed or Ordered Produced in Other Litigation," expressly envisions this scenario and notes that a party could indeed be subpoenaed in a different proceeding to produce information designated AEO in the Sotloff Action.  Pursuant to this provision, it is Respondent's responsibility to seek a subsequent protective order and then for "*the court from which the subpoena or order issued*"—*i.e.*, this Court (not Judge Middlebrooks)—to make a determination regarding such an order.  Serio Decl., Ex. A § 8 (emphasis added).  In other words, the Confidentiality Order expressly recognizes that any redaction of a document in *Sotloff* would *not* protect the document, much less the underlying factual information, from disclosure in perpetuity, but instead suggests mechanisms by which a party can *attempt* to maintain such designations in future proceedings in *other courts*.

**B.    Respondent's Reliance on "Collateral Estoppel" with Respect to the Confidentiality Order Is Likewise Misplaced.**

Because the Confidentiality Order in no way bars the disclosure of facts underlying the Forged Record, Petitioners are *not* collaterally estopped from seeking Section 1782 discovery.  In order for the doctrine of collateral estoppel to preclude litigation of an issue, "[1] the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case," "[2] the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case," and "[3] preclusion in the second case must not work a

basic unfairness to the party bound by the first determination." *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n,* 439 F.3d 740, 743 (D.C. Cir. 2006) (quoting *Yamaha Corp. of America v. United States*, 961 F.2d 245, 254 (D.C. Cir.1992)).  Even a cursory analysis of these factors under the relevant law of collateral estoppel confirms that the doctrine does not apply here.  Respondent, as the "party invoking collateral estoppel," therefore has failed to meet its "burden of establishing that the conditions for its application have been satisfied." *Id.*

First, the issues raised in the two proceedings are *not* the same, because Respondent has failed to demonstrate that the "facts pertinent" to the earlier Confidentiality Order are "*identical*" to those in the present Application. *See* 18 James W. Moore, *et al.*, *Moore's Federal Practice* § 132.02[2][3], at 27-29 (3d ed. 2008) (emphasis added).  The Sotloff Plaintiffs and Petitioners litigated whether the Confidentiality Order allowed a party unilaterally to designate information AEO, specifically in regard to the Forged Record.  The parties did *not* litigate those designations, much less the production of key facts related to the Forged Record's creation that would support a fraud proceeding in a foreign jurisdiction.

Second, Judge Middlebrooks did *not* decide the issue now raised in Petitioners' Section 1782 Application: the creation and transmission of the Forged Record.  Respondent has thus failed to demonstrate that there is *no "uncertain[ty]* whether the issue was *actually and necessarily decided* in that [first] litigation," *Connors v. Tanoma Mining Co.*, 953 F.2d 682, 684 (D.C. Cir. 1992) (emphases added).  The information sought in the Application and the issues before this Court could never, of course, have been submitted to Judge Middlebrooks at the time of the Confidentiality Order, because neither the court nor the parties had yet learned that the record was forged.  *See Sorenson Commc'ns, Inc. v. F.C.C.,* 765 F.3d 37, 44 (D.C. Cir. 2014) (collateral estoppel does not apply "where the situation is vitally altered between the time of the first judgment and the second" (quoting *Comm'r v. Sunnen,* 333 U.S. 591, 599-600 (1948))).

Third, preclusion here would work a "basic unfairness" to Petitioners, because Petitioners "clearly *[lacked] any incentive* to litigate . . . in the [Sotloff Action]" the issue presented here. *Brodie v. Jackson*, No. 11-cv-1769 (BJR), 2014 WL 11813594, at *4 (D.D.C. July 7, 2014) (emphasis added) (quoting *Yamaha*, 961 F.2d at 254), *aff'd*, 630 F. App'x 1 (D.C. Cir. 2015).  Nor did Petitioners have any reason to know at the time that this Application would be necessary.  At the time of the Confidentiality Order, Respondent had yet to produce the fraudulent document to Petitioners, meaning that Petitioners did not yet have the opportunity to examine the Forged Record and determine that it was fraudulent and replete with patent indicia of inauthenticity. Without this key information, including the Forged Record itself, Petitioners lacked a full and fair opportunity to litigate the central issue of obtaining the identities of those with knowledge of its forgery.  *See id.* (finding plaintiff was not collaterally estopped from litigating claims because he "lacked incentive to litigate the issues . . . in the prior proceeding, as he was unaware of" certain key information at the time of his initial suit).

For these reasons, Petitioners are not collaterally estopped from seeking the requested Section 1782 discovery.

## II.    Petitioners' Requested Discovery Is Not Barred by the Work Product Doctrine.

Respondent separately argues that the Application should be denied because it purportedly is an "attempt to side-step attorney work-product protections."  Opp. at 26-27.   Respondent's contention is based on the erroneous premise that "[t]he identity of persons interviewed by counsel is protected by the work-product privilege."  *Id*. at 26.  While Respondent claims this assertion is supported by *United States v. All Assets Held at Bank Julius Baer & Co.*, 270 F. Supp. 3d 220 (D.D.C. 2017), Judge Moss recently made clear that the work-product doctrine is not nearly as sweeping as Respondent claims.

10

Judge Moss clarified the contours of the *All Assets Held* decision in *Savignac v. Jones Day*, 586 F. Supp. 3d 16 (D.D.C. 2022); specifically, *Savignac* explained that *All Assets Held* "concluded that the work-product privilege barred an interrogatory that sought the identities of *all persons 'who had been interviewed by Claimant, or from whom statements or documents had been obtained by Claimant, in relation to the facts and allegations of the Amended Complaint.*'" *Savignac*, 586 F. Supp. 3d at 19 (quoting *All Assets Held*, 270 F. Supp. 3d at 222) (emphasis added) (cleaned up). *Savignac* explained, however, that *All Assets Held* had noted the "general distinction between requests for the *identities of individuals who have knowledge about the claims, defenses, or other relevant issues in a case*, on the one hand, and requests for the *identities of individuals whom opposing counsel has contacted or interviewed in preparation for litigation*, on the other." *Id.* at 20 (emphases added).  Based on that distinction, *Savignac* ultimately found that a narrowly tailored request asking for the identities of individuals with whom a lawyer had "conferred or consulted" regarding a key issue fell outside the scope of the attorney work-product doctrine and was therefore discoverable.  *See id.* at 18.[3]

Here, Respondent attempts to blur the distinction between overbroad discovery requests seeking comprehensive witness lists tied to the litigation, which may be protected by the attorney work-product doctrine, and narrower requests for the identities of witnesses who have knowledge of specific issues in the case, which are proper subjects of disclosure.  The Application falls squarely within the latter category.

---

[3] *Savignac* also found that even a separate part of the discovery request asking plaintiffs to disclose "the identities of the persons with whom they consulted in anticipation of this litigation" was permissible, explaining that "although a list of witnesses an attorney has interviewed in anticipation of litigation can, at times, permit a requesting party impermissibly to glean its opponent's strategy, that is not the case here."  *Id.* at 19.

Petitioners' two discovery requests are the clearly permissible type of requests that *Savignac* contemplated; the Application seeks limited information on: (1) "the identity and location of the Anonymous Source"; and (2) "the identities of individuals with whom You or the Anonymous Source discussed the Purported Transfer Record."[4]  Hallward-Driemeier Decl., Ex. 2 at 7-8.  The Anonymous Source is defined as the individual "who gave, sent, shared, or otherwise communicated a copy of the Purported . . . Transfer to You," *id.* at 6, while the Purported Transfer Record (the Forged Record) is defined and attached to the proposed subpoenas, *see id.* at 8, Attachment B.  These requests are therefore limited by and tethered to their specific relation to the Forged Record.  Under Judge Moss's analysis in *Savignac*, such requests are plainly permissible as they are "limit[ed] . . . to witnesses who may possess factual information relevant to the [Forged Record]."  *Savignac*, 586 F. Supp. 3d at 20.  While Respondent mentions Petitioners' citation of *Savignac* in the Application, Respondent makes no attempt to distinguish *Savignac* from the case at bar, citing instead to older cases that *Savignac* distinguished.

Furthermore, even if Petitioners' requests had more broadly sought the identities of all those witnesses whom Respondent interviewed in anticipation of litigation—which they do not—as in *Savignac*, Petitioners would "have requested the names . . . not as a method to glean [Respondent's] litigation strategy, but rather as an effort to identify witnesses who might have factual information relevant to an important issue in the case," which is "both relevant and not subject to the work-product privilege."  *Id.* at 21.  Petitioners have no interest in discerning Respondent's "strategy," which led to the filing of a case against them that was constructed around a single forged document—Petitioners are interested only in learning who created this forgery and how it came to be provided to Respondent.

---

[4] Petitioners' discovery requests also include six narrowly tailored deposition topics.

Finally, even if the requested discovery were attorney work-product (which it is not), courts have made clear that *factual* work-product is afforded less protection than opinion work-product, and that "[d]iscovery may be had into factual work product upon a party showing 'substantial need for the materials to prepare its case' and that it 'cannot, without undue hardship, obtain their substantial equivalent by other means.'" *Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1335 (11th Cir. 2018) (quoting Fed. R. Civ. P. 26(b)(3)(A));[5] *see also Savignac*, 586 F. Supp. 3d at 21 n.1 (noting that it did not need to reach this analysis because "the work-product privilege does not apply"). The requested discovery is critical, even necessary, to a contemplated suit in France that would seek to hold civilly and criminally accountable those who created the Forged Record, and Petitioners cannot prepare their case without the Court's assistance in obtaining such discovery from Respondent, the sole gatekeeper to the requested information.

Thus, Petitioners' request for the identities of the individuals who provided and discussed the Forged Record with Respondent is not protected by the attorney work-product doctrine.

## III.     Notwithstanding Respondent's Mischaracterizations, the Application Satisfies Both the Statutory Requirements and Discretionary Factors Under Section 1782.

Only after attempting to distract the Court with misleading claims concerning Judge Middlebrooks' Confidentiality Order does Respondent address the "two-stage inquiry [that]

---

[5] Similarly, in *In re Harmonic, Inc. Sec. Litig.*, the court granted a motion to compel the names of five confidential witnesses and reasoned:

> Even if the [confidential witnesses'] identities were protected work product, disclosure would nonetheless be required because, at best, the information is *factual work product*. The scope of that factual work product is minimal here since *the only information being withheld is the identities of the [confidential witnesses]*. Defendants' need for and interest in this information would overcome the *de minimis* work product under the balancing process between the work product interest and the interest in discovery.

245 F.R.D. 424, 429 (N.D. Cal. 2007) (emphases added) (collecting cases from various federal circuits).

informs whether a federal court will grant a motion under [S]ection 1782[]": the Section 1782 statutory requirements and the discretionary *Intel* factors.  *In re Miya Water Projects Netherlands, B.V.*, No. 1:23-mc-43 (CRC/GMH), 2023 WL 6294001, at *6 (D.D.C. Sept. 27, 2023); *see* Opp. at 14-28.  Rather than meaningfully address this inquiry, Respondent badly mischaracterizes the Application, arguing that Petitioners fail to meet the second statutory requirement of Section 1782 and the discretionary *Intel* factors because "Petitioners do not know who they intend to sue, where they intend to sue them, what claims they intend to bring (which necessarily depend on which jurisdiction is selected), or when they intend to make their filing."  Opp. at 17.

Respondent reaches this conclusion by attacking a straw argument of its own making.  In so doing, Respondent conspicuously ignores the specific statements in the Application that precisely set forth the who, what, when, where, and why.  The Application explicitly states that the Petitioners seek from Respondent limited discovery identifying those responsible for creating and disseminating the Forged Record, so that Petitioners can: (1) sue those specific individuals; (2) *at least* in France and potentially in other jurisdictions; (3) under the French causes of action specifically identified by QNB's retained French counsel: a civil action under *faute* and a criminal action under *faux et usage de faux* (as a criminal complainant); (4) imminently upon the *necessary* receipt of the Forgers' identities.  *See* Appl. at 12-13.  Contrary to Respondent's contentions, such specificity satisfies all of the statutory requirements and discretionary *Intel* factors.[6]

Indeed, seeking the identities of individuals necessary to initiate specific causes of actions against those individuals satisfies the second statutory "for use" requirement of Section 1782, as no foreign proceeding can commence without knowledge of the identities of these individuals.  *See*

---

[6] In its Opposition, Respondent concedes that Petitioners meet both the first and third statutory requirements of Section 1782. *See* Opp. at 14.

*In re Pishevar*, No. 21-mc-105, 2023 WL 2072454, at *2 (D.D.C. Feb. 17, 2023) ("[T]he identity of the . . . [s]ource is instrumental to pursuing [the petitioner's] claims.").  Critically, the court in *Pishevar* explained that "Section 1782 *does not require foreign proceedings to be 'pending' or 'imminent,'* so courts may authorize discovery '*provided that the foreign proceedings are within reasonable contemplation when the request for judicial assistance is filed.*'" *Id.* (emphases added) (quoting *In re DiGiulian*, 314 F. Supp. 3d 1, 6 (D.D.C. 2018));[7] *see also In re C5 Cap. Ltd.*, No. 1:24-mc-10 (TNM), 2024 WL 1701650, at *2 (D.D.C. Apr. 18, 2024) (noting, in the context of Section 1782 application compelling discovery from a law firm, that "Section 1782(a) permits identify-confirming discovery").

As clearly set forth in the Application, Petitioners further satisfy the first, second, and fourth *Intel* factors by directing narrowly tailored discovery requests to the Respondent to obtain the identities of the Forgers, in order to initiate proceedings in France.

Respondent's assertion that the first *Intel* factor weighs against Petitioners because "the Sotloffs" are purportedly "the real target of the discovery sought in the present Application" and "Petitioners have . . . provided no clarity" about whether the Sotloffs "will be participants in the foreign proceedings," Opp. at 19, could not be further from the truth.  Petitioners have zero interest in burdening the Sotloffs, who have already experienced unspeakable tragedy and were themselves bystander victims of the culprits' fraudulent scheme.  Rather, as the plain language of the Application makes clear, Petitioners expressly seek from Respondent the identities of the Forgers,

---

[7] Respondent tries to distinguish *Pishevar* by arguing in a footnote that *Pishevar* "involved a petitioner who clearly identified the target and location of the foreign proceeding." Opp. at 15 n.5. However, in *Pishevar*, the petitioner filed a Section 1782 application seeking the identity of a "male lawyer based in the UK," in regard to a fake police report (that smeared the petitioner with an allegation of rape).  That application is indistinguishable from this one, which seeks the identities of those with knowledge of the Forged Record, including "at least one individual located in Paris, France" based on assertions made by Respondent.  Appl. at 7.

as evidenced by the subpoenas attached to the Application (which make no reference whatsoever to the Sotloffs), *see* Hallward-Driemeier Decl. Ex. 2., so that Petitioners can hold the Forgers, not the Sotloffs, liable.[8]

Nor is it true, as Respondent claims, that the second *Intel* factor weighs against Petitioners because "[t]here is no way to assess how receptive a foreign jurisdiction would be to the discovery sought herein because Petitioners, admittedly, do not know where they intend to file the present suit." *See* Opp. at 20. Petitioners have already stated that France is at least one relevant jurisdiction, a connection that Respondent acknowledges in its Opposition. *See* Opp. at 25 (detailing a key meeting involving a "member of the Perles Law Firm . . . at a law office in France"). Respondent nonetheless ignores Petitioners' argument that France is patently receptive to the discovery sought by them under Section 1782. *See* Appl. at 16 ("[T]he most likely jurisdiction in QNB and QC's view, France, would almost certainly be receptive to such assistance."); *In re Rigby*, No. 13-cv-271, 2013 WL 622235, at *2-3 (S.D. Cal. Feb. 19, 2013) (cited in Appl. at 16) (concluding that "French courts would be receptive to the introduction of evidence obtained pursuant to § 1782"); *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F. 3rd 1095,

---

[8] The *Pishevar* court considered and rejected an analogous argument and, in holding that "the first factor weighs in favor of granting Mr. Pishevar's [Section 1782] request," wrote:

> [T]he requested subpoenas are directed at Fusion GPS, but Mr. Pishevar does not plan to sue Fusion GPS in the English courts. Mr. Pishevar plans to pursue his claims against the UK Source. His request is aimed at Fusion GPS because the investigations company appears to be the best source of information on the identity of the UK Source—the individual or individuals who will ultimately become the "participant[s] in the foreign proceeding.

*Pishevar*, 2023 WL 2072454, at *3. Likewise for Petitioners: (1) the subpoenas are directed at Respondent, but Petitioners do not plan to sue Respondent in the French courts; (2) Petitioners plan to pursue their claims against the Forgers; and (3) Petitioners' request is aimed at Respondent only because it is the best source of information on the identity of the Forger(s), against whom Petitioners will bring their suit.

1100-01 (2d Cir. 1995) ("[W]e are unable to accept the district court's conclusion that granting [petitioner's] discovery request [under Section 1782] will in fact offend the people of France."). Moreover, Respondent fails to address the prevailing presumption of foreign courts' receptivity to such discovery. *See* Appl. at 15. "Courts in the United States also presume that foreign tribunals will be receptive to evidence obtained here, and ordinarily consider 'only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782.'" *Pishevar*, 2023 WL 2072454, at *3 (quoting *DiGiulian*, 314 F. Supp. 3d at 8)*; see also In re Veiga*, 746 F. Supp. 2d 8, 23-24 (D.D.C. 2010) ("The party resisting discovery *must point* to 'authoritative proof' that the foreign tribunal would reject the evidence sought." (emphasis added)). Respondent provides no such "authoritative proof" nor, indeed, any rebuttal at all.

Further, Petitioners' limited and focused Application—two requests for documents and six deposition topics in order to ascertain the identities of the Forgers—is not, under the fourth *Intel* factor, "unduly intrusive or burdensome." 542 U.S. at 265. Respondent apparently recognizes this, implicitly conceding that Petitioners seek "narrowly targeted discovery." Opp. at 28; *see In re C5 Cap*., 2024 WL 1701650, at *3 (noting that a limited number of discovery requests seeking information from a law firm that "bear[] directly on Applicants' forthcoming claims . . . . [are] not 'unduly intrusive or burdensome.' (quoting *Intel*, 542 U.S. at 265)).[9]

---

[9] Respondent focuses on the purported "confidential" nature of the information Petitioners seek, citing to the Confidentiality Order. Opp. at 28. But for the reasons articulated above, *see supra* Section I.A, Petitioners' requests have *nothing* to do with the subject of the Confidentiality Order. There is nothing confidential about the name of a forger who perpetrated a fraud on the Petitioners and a U.S. court. Why Respondent would seek to shield the perpetrator of a fraud from judicial scrutiny remains unclear, especially considering that one of the victims of that fraud apparently was Respondent's own client, the Sotloffs. But, again, *Intel*, on which Respondent relies, makes clear that the remedy for any "confidentiality" concerns is *not* outright denial of a discovery request, but "consideration of 'appropriate measures, if needed, to protect the confidentiality of materials.'" *Intel*, 542 U.S. at 265 (quoting *In re Bayer AG*, 146 F.3d at 196); *see supra* Section I.A.

Finally, Respondent's reliance on the third *Intel* factor as a catch-all to assert that the Application circumvents proof-gathering restrictions fares no better.[10]   The Application is not filled with, as Respondent claims, "omissions demonstrat[ing] that it was made in bad faith" nor "inexcusable failure[s] to disclose to this Court the fact that the Confidentiality Order bars the very disclosure Petitioners seek." Opp. at 21-22.   Petitioners referenced and, moreover, explained the background of the Confidentiality Order in their earlier Application and Declaration attached thereto, which Respondent has conveniently ignored.  *See* Appl. at 6 & n.1 (providing a detailed account of the Confidentiality Order in connection with the "Purported Transfer Record"); *see also* Hallward-Driemeier Decl. ¶ 16 & n.2 (same).  Respondent's accusations of bad faith are nothing but a smokescreen—just another facet of Respondent's attempt to distract the Court with unfounded claims that are not only contradicted by the record, but also unbecoming of experienced counsel.

Nor does Petitioners' Application "violate, frustrate, or offend United States public policy." Opp. at 24.  Respondent baselessly and offensively smears Petitioners, with no proof or citation to any sources other than self-serving and vague declarations, in suggesting that certain purported intimidation attempts were perhaps made "by an individual . . . at the *behest* of QNB and QC." *Id.* at 24-25 (citing Perles Decl. ¶ 13).  Notably, the paragraph of the Perles Declaration to which Respondent cites as sole support for this defamatory assertion makes no attempt whatsoever to attribute the events described to Petitioners.   More to the point, the Perles

---

[10] Many of Respondent's arguments regarding the third *Intel* factor have already been dispensed with in this Reply: Petitioners explicitly identified a foreign jurisdiction in which suit would be filed, *see supra* Section III; the Confidentiality Order in no way bars the disclosure Petitioners seek (and therefore does not circumvent U.S. proof-gathering restrictions), *see supra* Section I; and the requested discovery is not attorney work product, and even if it were, it would only be factual work product for which Petitioners have shown a substantial need, *see supra* Section II.

Declaration merely repeats what the witness (who was presumably one of the Forgers or someone affiliated with them) "reported to [Perles's] office." Perles Decl. ¶ 13. In other words, a party responsible for perpetrating an outrageous defamatory fraud against Petitioners, who has been unveiled as such, is now apparently seeking to hide his or her identity by doubling down and inventing an entirely new set of false and unsubstantiated accusations against Petitioners.

Respondent's reliance on *In re Pishevar*, 439 F. Supp. 3d 290, 305 (S.D.N.Y. 2020), as denying a Section 1782 application "based on the U.S. public policy that undergirds the reporter's privilege," Opp. at 24, omits that the district court, in a subsequent opinion, *reversed course* when it realized that, because the petitioner had no "reasonable alternative sources of information[,] . . . the reporter's privilege has been overcome and Respondent shall disclose to Petitioner the name and location of his Confidential Source." *In re Pishevar*, No. 119-mc-00503 (JGK) (SDA), 2020 WL 8299764, at *5 (S.D.N.Y. Oct. 3, 2020).[11]

The Court should likewise reject Respondent's attempt to smear Petitioners by reference to other unsubstantiated accusations made in other litigations. *See* Opp. at 6, 26. Notably, there

---

[11] Respondent's other legal citations regarding U.S. public policy as defeating Section 1782 applications are similarly misleading or inapposite. *Republic of Gambia v. Facebook, Inc.*, on which Respondent relies, hinged only on the Stored Communications Act (SCA) as it related to Facebook posts, not, as Respondent claims, on general "public policy concerns." *See* 575 F. Supp. 3d 8, 11 (D.D.C. 2021) (noting that the "Court need take up only the first" objection by Facebook that the "SCA prohibits Facebook from disclosing these communications" but not the second objection regarding potential abuse of discretion in relation to the *Intel* factors). Respondent's reliance on *In re Hulley Enters.*, 400 F. Supp. 3d 62 (S.D.N.Y. 2019), is even more seriously misplaced. There, the magistrate judge's opinion, which the cited case fully affirmed, actually stated that *Intel's* third "factor *favors* production" and so came out the other way on that relevant factor. *See In re Hulley Enters.*, 358 F. Supp. 3d 331, 348 (S.D.N.Y. 2019), *aff'd*, 400 F. Supp. 3d 62. As the district court later noted, the magistrate judge had properly denied the application based on "Petitioners' delay [of many years] in filing their § 1782 application" and on "a lack of clarity in *Russian* privilege and confidentiality laws," neither of which is true here. *See Hulley*, 400 F. Supp. 3d at 73 (emphasis added). Thus, none of Respondent's cases endorses the misguided approach to the public policy factor that Respondent urges.

19

has *not been a single factual finding or dispositive judgment against Petitioners in any of those proceedings*; indeed, the *only dispositive rulings in those suits thus far have all been in favor of Petitioners*.[12]   This Court should dismiss such feeble attempts to bootstrap unsubstantiated allegations in other complaints (that have in many instances been affirmatively disproven and rejected) to sully Petitioners' reputations as a way of protecting the identities of those who have perpetrated a gross fraud against Petitioners and the courts of the United States.

## IV.   Respondent's Transfer Request Is at Odds with Both the Law and the Facts.

Respondent's alternative request for transfer of this Application to the Southern District of Florida pursuant to 28 U.S.C. § 1404(a) should be denied.   Respondent has failed to satisfy its burden to demonstrate *both* that (1) this Application "might have been brought" in the Southern District of Florida, *and* (2) transfer to that district is more "convenien[t]" for the "parties and witnesses" and "in the interest of justice."  *Robinson v. Eli Lilly & Co.*, 535 F. Supp. 2d 49, 51 (D.D.C. 2008) (quoting 28 U.S.C. § 1404(a)); *see Smith v. Yeager*, 234 F. Supp. 3d 50, 56 (D.D.C. 2017) ("[T]he purpose of § 1404(a) is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." (cleaned up)).

---

[12] *See Przewozman v. Qatar Charity*, No. 20-cv-6088, 2023 WL 2562537 (E.D.N.Y. Mar. 16, 2023) (claims against QNB and QC dismissed, later with prejudice); *Sotloff v. Qatar Charity*, No. 22-cv-80726, 2023 WL 6471413 (S.D. Fla. Sep. 28, 2023) (claims against QNB and QC dismissed with prejudice following discovery of key fraudulent document); *Henkin v. Qatar Charity*, No. 21-cv-5716, 2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023) (claims against QNB dismissed); *id.*, ECF No. 115 at 2 (explaining that jurisdictional discovery regarding QC had failed to substantiate plaintiffs' jurisdictional allegations.  In *Force v. Qatar Charity*, No. 20-cv-02578 (E.D.N.Y.), the only other active litigation between Petitioners and plaintiffs represented by Respondent, a motion to dismiss remains pending.

### A.     Respondent Has Not Satisfied Its Burden to Show That the Application Could "Have Been Brought" in the Southern District of Florida.

A court considering a transfer request under Section 1404(a) must first determine whether "venue in the proposed transferee district would be proper." *Robinson*, 535 F. Supp. 2d at 51 (quoting 28 U.S.C. § 1404(a)).  This requires the moving party, here Respondent, to demonstrate that "the [Application] 'might have been brought'" in the Southern District of Florida in the first instance. *Id.*

Respondent acknowledges that Petitioners were required to file the Application where the Perles Law Firm "resides or is found" within the meaning of Section 1782. *See* Opp. at 14 (quoting 28 U.S.C. § 1782).  Respondent errs, however, when it conflates personal jurisdiction with the requirements of Section 1782, claiming simplistically that the Application "might have been brought" in S.D. Fla. because "[p]ersonal jurisdiction exists over Perles" from "pursu[ing] the Sotloff Action." Opp. at 29.  But in the Southern District of Florida, whose law would have governed the filing, the "relationship between section 1782 and the contours of personal jurisdiction are *not* the same." *In re Deposito Centralizado de Compensacion y Liquidacion de Valores Decevale, S.A.*, No. 20-mc-25212, 2021 WL 2323226, at *5 (S.D. Fla. June 1, 2021) (citation omitted); *see FMC Corp. v. EPA*, 557 F. Supp. 2d 105, 110 n.3 (D.D.C. 2008) ("The propriety of the transferor court's decision is determined by reference to the law governing the transferee court.").  In particular, courts in that district have explained that, when evaluating whether a party "resides or is found" in a district under Section 1782, "[n]ot only should courts look at the respondent's contacts with the forum, but if the discovery material sought proximately resulted from the respondent's forum contacts." *In re Deposito*, 2021 WL 2323226, at *5 (citation omitted) (respondent was not "found" in S.D. Fla. under Section 1782, despite owning real property, registering vehicles, paying real estate taxes, maintaining phone numbers, and managing

entities there, because the applicant "failed to show with specificity that [the individual's] contacts with this District are the primary reason that the evidence sought is available at all").

While Respondent claims that the Application "relates directly to work Perles completed on behalf of the Plaintiffs in the underlying Southern District of Florida action," Opp. at 30, Respondent does not and cannot argue that the discovery Petitioners seek—information related to the Forged Record—"proximately resulted from" the Sotloff Action.  To the contrary, it was the Sotloff Action that proximately resulted from the Forged Record, not the other way around.  Moreover, information regarding the Forged Record is in the sole possession and control of Respondent, a law firm physically located and headquartered in the District of Columbia, not Florida.[13]  *See In re Inmobiliaria Tova, S.A.*, No. 20-mc-24981, 2021 WL 925517, at *5 (S.D. Fla. Mar. 10, 2021) (noting that the requested documents "are not even in this forum" in holding respondent was not "found" in the district under Section 1782 because of insufficient contacts).

Accordingly, because Respondent fails to establish that this Application could properly have been brought in the Southern District of Florida, Respondent's transfer request fails.[14]

### B.      Respondent Also Has Not Satisfied Its Burden to Show That the Southern District of Florida Would Be More "Convenient" for the "Parties and Witnesses" and That Transfer Would Be in the "Interest of Justice."

Even if the Court were to determine that the Southern District of Florida would have been a proper venue (which it is not), the Court would need to "weigh in the balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition

---

[13]  Respondent "does not dispute that it is found within this District" under Section 1782.  Opp. at 14.

[14]  Only one of the cases cited by Respondent concerning personal jurisdiction was decided by a Florida court, and that case, *Tufts v. Hay*, 977 F.3d 1204, 1211 (11th Cir. 2020), did not involve a Section 1782 application, meaning there was no analysis of whether the target of discovery "resides or is found within" the district under the test applied by the S.D. Fla. under Section 1782.  *See* Opp. at 29-30.

to the private concerns of the parties, come under the heading of 'the interest of justice.'" *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 771 F. Supp. 2d 42, 46 (D.D.C. 2011) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30 (1988)) (cleaned up).  The party seeking transfer "bear[s] the burden of showing that the balance of case-specific factors favors transfer." *In re Vitamins Antitrust Litig.*, 263 F. Supp. 2d 67, 69 (D.D.C. 2003).

"The public factors to assess include 1) the local interest in making local decisions about local controversies, 2) the potential transferee court's familiarity with applicable law, and 3) the congestion of the transferee court compared to that of the transferor court." *Westrick*, 771 F. Supp. at 46 (quoting *Demery v Montgomery Cnty, Md.*, 602 F. Supp. 2d 206, 210 (D.D.C. 2009)).  "The private factors to assess include 1) the plaintiff's choice of forum, 2) the defendant's choice of forum, 3) where the claim arose, 4) the convenience of the parties, 5) the convenience of the witnesses, particularly if important witnesses may actually be unavailable to give live trial testimony in one of the districts, and 6) the ease of access to sources of proof." *Id.* (cleaned up). Collectively, these factors weigh heavily against transfer.

First, the public interest regarding the present dispute lies in this District.  The "locus" of the Application is this District: Petitioners, represented by counsel located in Washington, D.C., seek limited discovery that is in the sole possession and control of a law firm headquartered and located in Washington, D.C.  *See Westrick*, 771 F. Supp. at 48.

While Respondent contends that the "Southern District of Florida's interest is significant," Opp. at 31-32, nothing supports this claim, which fails to recognize that the Sotloff Action was dismissed with prejudice many months ago, and that there is thus no active litigation in S.D. Fla. concerning the Forged Record. [15]   Respondent's misleading assertion that the Confidentiality

---

[15]  As this Court has reasoned in an analogous case, Petitioners' "claims for relief arise entirely under . . . a Federal statute, and neither party indicated related actions are pending in the [transferee

Order "directly governs the disclosure of the discovery Petitioners seek," Opp. at 31, merely perpetuates the same false claim that has been refuted above. *See supra* Section I.A.  Nor has Respondent provided any explanation whatsoever as to how or why the Sotloffs are "most impacted" by disclosure of the identities of those responsible for the Forged Record. The Sotloffs themselves were presumably *victims* of the fraud (by being misled as to the source of their loss), not its perpetrators.  If the Application is granted, Respondent, not the Sotloffs, will respond to Petitioners' discovery requests.  *See id* at 31-32.  Thus, Respondent fails to satisfy its burden to demonstrate that the public interest tips the scales toward transferring the Application to the Southern District of Florida.

Moreover, the private interests also weigh in Petitioners' favor.  While Petitioners do not reside in this District, their choice of forum is entitled to deference when, as here, the forum has a "meaningful relationship to the [Petitioners'] claims." *Westrick*, 771 F. Supp. at 47.  In contrast, Respondent's "choice of forum . . . is not ordinarily entitled to deference"; therefore, when Respondent moves to transfer, it "must establish that the added convenience and justice of litigating in [its] chosen forum overcomes the deference ordinarily given to [Petitioners'] choice." *U.S. Dominion, Inc. v. Herring Networks, Inc*., 639 F. Supp. 3d 143, 160 (D.D.C. 2022) (citation omitted)*.*  Respondent does not meet its burden, as Respondent fails to explain how it is more just or convenient for a D.C.-based law firm to litigate a collateral discovery issue in S.D. Fla., a forum that dismissed the Sotloff Action with prejudice over seven months ago.[16]  *See, e.g.*, *id*.

---

forum], therefore the . . . public factor does not weigh in favor of transferring this case." *Foote v. Chu*, 858 F. Supp. 2d 116, 123 (D.D.C. 2012).  In other words, even if the Southern District of Florida were "competent to decide" the Application, as Respondent argues, Opp. at 32, that would not mean the Southern District of Florida *should* decide the Application.

[16]  Respondent claims that "[t]he Southern District of Florida would be as equally convenient for the Petitioners as the District of Columbia, and would be preferable to Perles."  Opp. at 31.  But

(defendants' residency and "extensive business" in Washington, D.C. weigh against transfer).  Nor does Respondent explain its conclusory claim that the "Southern District of Florida would be able to access the core sources of proof in this case more easily, namely the [Forged] Record and the Confidentiality Order," two documents that are already attached to the Application and Opposition filed in this Court.  *See* Hallward-Driemeier Decl. Ex. 8; Serio Decl., Ex. A.  Once again, Respondent is engaged in misdirection by acting as though Petitioners seek information about an actual historical artifact, rather than information about those responsible for the creation and use of a forgery in an elaborate scheme to defraud.  The location of *that* information, which is the most "significant event[] giving rise to the [Application]"—is in Respondent's sole possession and control here at its Washington, D.C. headquarters.  *U.S. Dominion*, 639 F. Supp. at 143.  There is no reason why Petitioners' D.C.-based counsel should travel to the Southern District of Florida to take discovery of a D.C.-based Respondent about information that resides in D.C.  Collectively, these private interest factors weigh against transfer, further demonstrating that Respondent's transfer request is inappropriate and should be denied.

## **CONCLUSION**

For the foregoing reasons, Petitioners respectfully request that the Court (a) grant the Application and Petition for an Order to Conduct Discovery; (b) enter the Proposed Order attached to the Declaration of Douglas Hallward-Driemeier as the first exhibit, *see* ECF No. 1, Ex. 1; (c) authorize Petitioners, pursuant to 28 U.S.C. § 1782, to serve the Subpoenas, *see* ECF No. 1, Ex. 2; and (d) grant any and all other relief to Petitioners as the Court deems just and proper.

---

transfer is not about what is "preferable" for Respondent.  Transfer "should lead to an *overall increase in convenience for the parties*."  *Westrick*, 771 F. Supp. at 48 (emphasis added).

Dated: May 1, 2024                    Respectfully submitted,

                                      */s/ Douglas Hallward-Driemeier*
                                      _____
                                      Douglas Hallward-Driemeier (D.C. Bar No. 994052)
                                      **ROPES & GRAY LLP**
                                      2099 Pennsylvania Avenue, N.W.
                                      Washington, DC 20006-6807
                                      Tel: (202) 508-4776
                                      douglas.hallward-driemeier@ropesgray.com

                                      Michael G. McGovern (*pro hac vice forthcoming*)
                                      **ROPES & GRAY LLP**
                                      1211 Avenue of the Americas
                                      New York, NY  10036-8704
                                      Tel: (212) 596-9000
                                      michael.mcgovern@ropesgray.com

                                      *Counsel for Petitioner Qatar National Bank*
                                      *(Q.P.S.C.)*


                                      John M. Hillebrecht (*pro hac vice forthcoming*)
                                      Kevin Walsh (*pro hac vice forthcoming*)
                                      Jessica A. Masella (*pro hac vice forthcoming*)
                                      Michael G. Lewis (*pro hac vice forthcoming*)
                                      Erin Collins
                                      **DLA PIPER LLP (US)**
                                      1251 Avenue of the Americas
                                      New York, NY 10020-1104
                                      Tel: (212) 335-4500
                                      john.hillebrecht@us.dlapiper.com
                                      kevin.walsh@us.dlapiper.com
                                      jessica.masella@us.dlapiper.com
                                      michael.lewis@us.dlapiper.com
                                      erin.collins@us.dlapiper.com

                                      *Counsel for Petitioner Qatar Charity*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 1, 2024, a true and correct copy of the foregoing was served via transmission of Notices of Electronic Filing generated by CM/ECF on all counsel or parties of record.

<em><u>/s/ Douglas Hallward-Driemeier</u></em><br>
Douglas Hallward-Driemeier