**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE APPLICATION OF QATAR NATIONAL BANK (Q.P.S.C.) AND QATAR CHARITY FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | No. 1:24−mc−00035−LLA |

**RESPONDENT PERLES LAW FIRM, P.C.'S MEMORANDUM
IN OPPOSITION TO PETITIONERS' MOTION TO COMPEL**

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

PRELIMINARY STATEMENT ................................................................................................ 1

I.     FACTUAL AND PROCEDURAL BACKGROUND ........................................... 5

     A.    The Murder of Steven Sotloff and the Sotloff Action ................................. 5

     B.    The Florida District Court Issues a Confidentiality Order ......................... 6

     C.    Perles Investigates the Transfer Record ..................................................... 6

     D.    Petitioners' Application and Subsequent Procedural History .................... 7

     E.    The Parties' Efforts to Resolve the Discovery Dispute .............................. 8

     F.    The Qatari Government's Retaliatory Tactics ............................................. 9

ARGUMENT ...................................................................................................................... 11

I.     PERLES IS NOT BARRED FROM RAISING OBJECTIONS TO
PETITIONERS' DISCOVERY REQUESTS ...................................................... 11

II.    PERLES'S SUPPORT PERSONNEL ARE NOT "FACT WITNESSES" ........... 13

III.   PETITIONERS' DISCOVERY REQUESTS ARE IRRELEVANT,
CUMULATIVE, AND WOULD IMPOSE AN UNDUE BURDEN
ON PERLES ....................................................................................................... 15

     A.    Petitioners' Discovery Requests Seek Information that Is Irrelevant to
Petitioners' Contemplated Foreign Litigation ........................................... 15

     B.    Petitioners' Discovery Requests Seek Information that Is Cumulative and
Duplicative ................................................................................................. 18

     C.    Petitioners' Discovery Requests Would Place an Undue Burden on Perles
by Subjecting Their Support Personnel to a Serious Risk of Harm .......... 19

IV.   THE MOTION TO COMPEL SHOULD BE DENIED BECAUSE THE
FEDERAL RULES PROHIBIT THE DISCLOSURE OF NON-TESTIFYING
EXPERTS' IDENTITIES ................................................................................... 24

     A.    Perles's Support Personnel Fall Squarely Within the Core of the Attorney
Work Product Privilege .............................................................................. 25

     B.    The Identities of Non-Testifying Experts Are Specially Protected Work-
Product ....................................................................................................... 27

<div align="center">i</div>

      C.     No Exceptional Circumstances Warrant Disclosure of Non-Testifying Experts' Identities ................................................................................... 28

V.     THIS COURT SHOULD DEFER ITS CONSIDERATION OF PETITIONERS' MOTION UNTIL THE SUPREME COURT HAS RESOLVED PERLES'S PENDING PETITION FOR A WRIT OF CERTIORARI................................... 30

CONCLUSION.......................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ager v. Jane C. Stormont Hosp. and Training Sch. for Nurses,*
    622 F.2d 496 (10th Cir. 1980) ............................................................................27

*In re Application of Auto-Guadeloupe Investissement S.A.,*
    2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) ......................................................13

*Bayer AG v. Betachem, Inc.,*
    173 F.3d 188 (3d Cir. 1999)................................................................................18

*Breiterman v. United States Capitol Police,*
    324 F.R.D. 24 (D.D.C. 2018)..............................................................................15

*Buzzfeed, Inc. v. U.S. Dep't of Justice,*
    318 F. Supp. 3d 347 (D.D.C. 2018) ....................................................................19

*Chiperas v. Rubin,*
    1998 WL 531845 (D.D.C. Aug. 24, 1998) ..........................................................25

*Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP,*
    339 F.R.D. 334 (D.D.C. 2021)......................................................................16, 29

*Dike v. City of Los Angeles,*
    2025 WL 2074553 (C.D. Cal. May 30, 2025) .....................................................14

*Doe v. District of Columbia,*
    231 F.R.D. 27 (D.D.C. 2005)..............................................................................28

*Friedman v. Bache Halsey Stuart Shields, Inc.,*
    738 F.2d 1336 (D.C. Cir. 1984)..........................................................................16

*Gov't of Ghana v. ProEnergy Servs., LLC,*
    677 F.3d 340, 343 (8th Cir. 2012) ......................................................................12

*Hickman v. Taylor,*
    329 U.S. 495 (1947)............................................................................................25

*In re Kidd,*
    2020 WL 5594122 (D. Conn. Sept. 18, 2020) .....................................................12

*Marine Petroleum Co. v. Champlin Petroleum Co.,*
    641 F.2d 984 (D.C. Cir. 1979)............................................................................28

*Mohawk Indus., Inc. v. Carpenter,*
    558 U.S. 100 (2009)............................................................................................12

*In re Nagatsuki Ass'n,*
    2020 WL 887890 (N.D. Cal. Feb. 24, 2020) .......................................................13

iii

*Phillips & Cohen, LLP v. Thorpe*,
    300 F.R.D. 16 (D.D.C. 2013)................................................................................23

*Qatar Nat'l Bank v. Perles L. Firm, P.C.*,
    2025 WL 2945746 (D.C. Cir. Oct. 17, 2025) .........................................4, 8, 12, 17

*Riley v. Univ. of Ala. Health Servs. Found., P.C.*,
    990 F. Supp. 2d 1177 (N.D. Ala. 2014) ................................................................14

*Savignac v. Jones Day*,
    586 F. Supp. 3d 16 (D.D.C. 2022) ........................................................................26

*Savoia-Mchugh v. Glass*,
    2022 WL 22902653 (N.D. Fla. May 2, 2022) .......................................................14

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982).............................................................................25

*Sourgoutsis v. United States Capitol Police*,
    323 F.R.D. 100 (D.D.C. 2017)........................................................................18, 19

*Strobl v. Werner Enters., Inc.*,
    577 F. Supp. 3d 960 (S.D. Iowa 2022) .................................................................27

*United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*,
    270 F. Supp. 3d 220 (D.D.C. 2017) ......................................................................25

*US Dominion Inc. v. My Pillow Inc.*,
    2024 WL 2880425 (D.D.C. June 7, 2024) .............................................................16

**Statutes**

28 U.S.C. § 1782.................................................................................1, 7, 12, 30

**Rules**

Fed. R. Civ. P. 26...............................................................................................18, 27

## PRELIMINARY STATEMENT

In erroneously claiming that Respondent Perles "disregards the courts' orders and attempts unilaterally to further narrow the scope of the Document Subpoena," Petitioners misapprehend the distinction between what this Court ruled—and what issues would become ripe for decision later—in its Order, ECF No. 22, affirmed by the D.C. Circuit Court, authorizing Petitioners to serve the subpoenas attached to their application for discovery under 28 U.S.C. § 1782 and requiring Perles "to respond to the subpoenas pursuant to the Federal Rules of Civil Procedure and this court's Local Civil Rules."  In accordance with the Order, Perles timely served responses and objections to the subpoenas, and the parties have had several meet and confer conferences (the "Meet and Confers") and exchanged discovery-related correspondence.

In these recent Meet and Confers and related correspondence, Perles has made clear that, pursuant to an appropriate confidentiality order, it intends to comply with the Court's Order by providing the "identity-confirming discovery" under Section 1782(a) sufficient to identify "an individual located in Paris, France, who had allegedly witnessed the [purported $800,000 wire transfer] transaction (the 'Anonymous Source')" that the Complaint in the Sotloff Action alleged was used to have "financed, in part, the execution of Mr. Sotloff."  ECF No. 21 at 2.  As Perles has represented in the Meet and Confers, the bank transfer record at the center of this dispute (the "Transfer Record") was ultimately provided to Perles through the efforts of a Syrian national who told Perles that he had witnessed the financing transaction reflected in the Transfer Record (*i.e.*, the Anonymous Source).  Perles has further disclosed to Petitioners that a second Syrian national, who at times acted as an informal translator (the "Translator," and together with the Anonymous Source, the "Fact Witnesses"), is also believed to have personal knowledge of the Transfer Record's creation and dissemination.  In addition, Perles disclosed that an attorney at a

transnational law firm introduced the Fact Witnesses to Perles and provided Perles with the copy of the Transfer Record that was ultimately produced to Petitioners in the Sotloff Action (the "Foreign Attorney"). Accordingly, Perles has agreed to identify and provide last known location information for those three individuals.

One would expect, based on Petitioners' prior representations to this Court, that Perles's offer to provide information on these individuals would be more than sufficient to satisfy Petitioners' discovery needs. However, Petitioners have now brought this motion seeking to compel Perles to disclose the identities of individuals who did not participate in, and have no personal knowledge of, the alleged plot to defame them. As Perles detailed to Petitioners in the Meet and Confers, apart from the Fact Witnesses and the Foreign Attorney, the only individuals with whom Perles discussed the Transfer Record are: (i) "Perles's Support Personnel" consisting of two independent translators (*i.e.*, translators who are neither of the Fact Witnesses), a consulting expert with a background in the Intelligence Services, and a consulting expert in financial transactions; (ii) three to five then-active Assistant United States Attorneys from the Eastern District of Virginia; and (iii) two or three attorneys at one law firm, Fleischman Bonner & Rocco LLP ("Fleischman Bonner"), that was considered as possible co-counsel in the Sotloff Action.[1]

In the Meet and Confers, Perles further explained that Perles's Support Personnel have no personal knowledge of the Transfer Record's creation and dissemination apart from what they heard in Perles's interviews of the Fact Witnesses, *i.e.*, they have no personal knowledge of or connection to the underlying facts. Perles explained its view that the identities of Perles's Support

---

[1] Although Petitioners apparently understood from the Meet and Confers that these federal prosecutors "also interviewed the Anonymous Source," that reflects a misapprehension of what Perles communicated to Petitioners, as Perles has no information suggesting that occurred. Rather, because Perles understood that those prosecutors were involved in prosecuting ISIS militants, Perles discussed the Transfer Record while seeking information from the prosecutors about whether they were pursuing Fadhel al Salim, a known ISIS terrorist and "judge," as well as an acknowledged member of the Al-Nusra Front, a U.S.-designated Foreign Terrorist Organization. ECF No. 1-4, at 2.

Personnel are irrelevant to the subject matter of the foreign proceeding that Petitioners contemplate initiating in France (the "Contemplated Foreign Litigation") and requested any information Petitioners could share regarding the relevance of the requested information to any claim that the Petitioners intend to pursue.  In response, Petitioners asserted that Perles is obligated to provide the information because it was requested in the document subpoena that the Court authorized to be served on Perles (the "Document Subpoena").  Imposing the burdens and risks of disclosure on Perles's Support Personnel is unfair and unnecessary, particularly where their testimony would be cumulative of that of the Fact Witnesses and the Foreign Attorney.  Perles respectfully submits that Petitioners have failed to provide a sufficient explanation as to how disclosure of the identities of Perles's Support Personnel—who lack personal knowledge of the creation and dissemination of the Transfer Record—will meaningfully advance the Contemplated Foreign Litigation so as to justify disclosure.

It is entirely proper for Perles to negotiate with Petitioners concerning the scope of responsive information called for by the Document Subpoena, in light of the information disclosed in the Meet and Confers, and to insist upon entry of an appropriate protective order before producing such responsive information.  Furthermore, this Court should determine what discovery is required to comply with the Document Subpoena—and what confidentiality terms will govern the production—on the current record, including the information provided in the Meet and Confer and in the declarations filed by the parties, which details new information about an ongoing campaign against a U.S. citizen currently detained in Qatar.[2]  Moreover, as the D.C. Circuit recognized, "[s]hould specific work product objections arise in responding to the subpoena, Perles may raise and litigate those objections in the district court 'in accordance with the Federal Rules

---

[2] Perles duly preserved its objections to the Document Subpoena by timely serving its Responses and Objections. *See* Serio Decl. Exh. AJ.

of Civil Procedure.'" *Qatar Nat'l Bank v. Perles L. Firm, P.C.*, 2025 WL 2945746, at *4 (D.C. Cir. Oct. 17, 2025).

Under these circumstances, Petitioners' refusal to negotiate regarding the scope of responsive information needed to comply with the Document Subpoena can only be viewed as an attack on the Perles Law Firm, a nationally recognized law firm dedicated to bringing civil actions on behalf of victims of terrorism, intended to expose Perles's Support Personnel to the risk of retaliation. The Federal Rules of Civil Procedure should not be interpreted to permit litigants to weaponize the discovery process as Petitioners have here.

Indeed, by demanding the identities of Perles's Support Personnel with whom Perles communicated in the course of its legal representation of the Sotloff family, even though none of them possess any independent, first-hand knowledge of the creation or dissemination of the Transfer Record, Petitioners plainly seek irrelevant, cumulative, and burdensome discovery that will do little, if anything, to advance their Contemplated Foreign Litigation, particularly given that it is unlikely that Petitioners will be able to locate the Fact Witnesses who have every reason to be in hiding given that a former Al Nusra member is now the President of Syria.[3] Serio Decl. Exh. AE. Petitioners' principal purpose then is to unmask the identities of Perles's confidential Support Personnel to a frequent litigation adversary with a history of retaliation against adverse litigation parties and to jeopardize the safety of these innocent individuals and their families.

For these reasons, and those set forth below, this Court should deny Petitioners' motion to compel, insofar as it seeks the identities of Perles's Support Personnel. With respect to the disclosure of the names and last known locations of the Fact Witnesses and the Foreign Attorney, Perles requests that any disclosure be made subject to the entry of the protective order proposed

---

[3] Perles has no information as to the current location of the Fact Witnesses.

and negotiated by Perles at the Meet and Confers ("Perles's Proposed Protective Order"). Serio

Decl. Exh. AG.[4]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Murder of Steven Sotloff and the Sotloff Action

This case arises out of the horrific murder of Steven Sotloff, an Israeli-American journalist

who was kidnapped by ISIS while documenting the Arab Spring independence movement and the

broader conflicts in the Middle East in 2013. Perles Decl. ¶ 4. After he was taken hostage, Mr.

Sotloff was held captive, tortured, and on August 13, 2014, tragically and publicly beheaded. *Id*.

Perles's investigation revealed that the man who ordered this heinous murder was Fadhel al Salim,

the ISIS "judge" and member of the Al Nusra Front. ECF No. 1-4, at 2.

In connection with Perles's representation of the Sotloff family, Perles was provided with

the Transfer Record, which allegedly documented a transaction at Ziraat Bank in the Republic of

Turkey in which Petitioners provided $800,000 in financing to al Salim. Perles Decl. ¶ 5. Perles

had received the Transfer Record from the Foreign Attorney who had also introduced Perles to the

Fact Witnesses. *Id.* ¶ 6.

On May 13, 2022, on behalf of the Sotloff family, Perles filed a lawsuit in the United States

District Court for the Southern District of Florida (the "Florida District Court") (Judge Donald M.

Middlebrooks presiding) seeking to hold Petitioners accountable for the murder of their beloved

son and brother. *See* ECF No. 1-4 at 3, 20, 26–27 (*Sotloff v. Qatar Charity, et al.*, No. 22-cv-

80726 (S.D. Fla.) (the "Sotloff Action")).

---

[4] Although Perles maintains that the disclosure of the identities of the federal prosecutors and the Fleischman Bonner attorneys would do nothing to advance their Contemplated Foreign Litigation, Perles does not object to the disclosure of these individuals subject to the entry of Perles's Proposed Protective Order.

### B.    The Florida District Court Issues a Confidentiality Order

During the course of the Sotloff Action, the Florida District Court ordered the Sotloffs to produce the Transfer Record.  Perles Decl. ¶¶ 6–7.  However, because of numerous concerns for the safety of the witnesses to the alleged financing identified on the Transfer Record, and over Petitioners' strenuous objections, the document was produced under a confidentiality order (the "Florida Confidentiality Order") that included attorneys' eyes only protections and use limitations. Perles Decl. ¶ 7; Serio Decl. Exh. C at 2.  This designation meant that the disclosure of information was limited to designated outside counsel (excluding the in-house personnel of Petitioners).  Perles Decl. ¶ 7–8.  The Florida Confidentiality Order expressly states that, "[e]ven after final disposition of this litigation," the Florida District Court "retain[s] jurisdiction over the Parties and any other person who accepts being bound by this Protective Order for the purpose of enforcing its terms." Serio Decl. Exh. C at 5.  The Florida Confidentiality Order remains in full force and effect today.

### C.    Perles Investigates the Transfer Record

Following the disclosure of the Transfer Record to counsel for Petitioners, counsel stated that they believed the Transfer Record contained indicia of forgery, including typographical errors found on the face of the document.[5]  Perles Decl. ¶ 10.  The Sotloffs, through Perles, then engaged in an extensive effort to verify the Transfer Record's authenticity in light of this information.  *Id.*

In August 2023, Perles met with the two Fact Witnesses, one of whom acted as an informal translator (the "Translator"), at a law office in Paris, France.  *Id.* ¶ 16.  The Translator reported to French police that, after this meeting, the Translator's car was broken into; various evidentiary

---

[5] Prior to the disclosure of the Transfer Record to counsel for QNB and QC, Perles was not aware of any inconsistencies on the face of the document that would cast doubt on its authenticity.  Unfortunately, the pre-complaint translation of the Transfer Record was provided to Perles by the Foreign Attorney; and the Foreign Attorney's translators appear to have inadvertently corrected the typographical errors in the document.  Additionally, Perles's efforts to have the Transfer Record translated via machine and human translation also did not result in these inconsistencies being brought to Perles's attention.

materials were removed; and a handwritten note in Arabic was left behind which, when translated, read: "This is a warning." *Id.* The Translator also reported receiving a series of threats via audio message on WhatsApp. *Id.* ¶ 17. The messages specifically mentioned the Sotloff Action and warned that the Translator was being surveilled. *Id.* The messages urged the Translator to "shut [their] mouth" about the case—even offering the Translator money to just "forget about the subject." *Id.* The messages went on to threaten the life of the Translator and the Translator's family, noting that they could be "reach[ed]" wherever they were. *Id.* The Translator was also told that their life was only "worth a bullet." *Id.* The messages also became increasingly graphic—with one message asking how it felt to "side with the family of a stinking American Jewish pig against a Muslim country[.]" *Id.*

Ultimately, the information provided by the Fact Witnesses in these investigatory interviews was consistent with the allegations set forth in the Sotloff Action. *Id.* ¶ 10. Nevertheless, despite Perles's effort to better understand the circumstances surrounding the Transfer Record's provenance, the Sotloffs could not be certain that they would be able to authenticate the document at trial. *Id.* Accordingly, on September 22, 2023, the parties agreed to a voluntary dismissal of the Sotloff Action with prejudice. *Id.*

### D. Petitioners' Application and Subsequent Procedural History

On March 12, 2024, Petitioners initially filed an ex parte application before this Court seeking discovery from Perles pursuant to 28 U.S.C. § 1782 (the "Application"). ECF No. 1 at 1. This Court granted the Application on February 10, 2025. ECF No. 22 at 1. Pursuant to this Court's decision on February 10, 2025, Petitioners served a document subpoena containing two requests for production and a testimonial subpoena containing six deposition topics.

On February 28, 2025, Perles appealed this Court's grant of the Application to the United States Court of Appeals for the District of Columbia Circuit.  ECF No. 23 at 1.  On October 17, 2025, the D.C. Circuit affirmed this Court's grant of the Application—but did so only after noting that Perles "may raise and litigate [specific work product] objections in the district court" in response to the subpoenas.  *Qatar Nat'l Bank*, 2025 WL 2945746, at *4.

### E.    The Parties' Efforts to Resolve the Discovery Dispute

Since the D.C. Circuit issued its ruling, Perles and Petitioners have engaged in multiple Meet and Confers and discovery-related correspondence concerning the scope and necessity of Petitioners' discovery requests.  During these Meet and Confers, Perles conveyed to Petitioners that it was willing to produce information responsive to the discovery requests by disclosing the identities and last known locations of the Fact Witnesses and the Foreign Attorney believed by Perles to have personal knowledge of the creation and dissemination of the Transfer Record. However, Perles urged that any disclosure related to these individuals needed to be subject to a court-approved protective order proposed by Perles ("Perles Proposed Protective Order") that contained provisions to protect witness safety and confidentiality.  *Id.*

Perles's Proposed Protective Order: (i) limits the use of information containing confidential information under the Florida Confidentiality Order ("Florida Protected Material") solely to the investigation and litigation of the instant matter and the Contemplated Foreign Litigation described in the Application; (ii) prohibits disclosure of Florida Protected Material to anyone other than the outside counsels of record for the parties in those proceedings, as well as to the respective courts and their personnel responsible for adjudicating those proceedings and/or to the appropriate law enforcement or prosecutorial entities in such Contemplated Foreign Litigation; and (iii) requires that, if Florida Protected Material is provided to any court, tribunal, judicial body, or law

enforcement or prosecutorial entity, Petitioners must take all reasonable measures to maintain the maximum possible confidentiality afforded under that jurisdiction's laws.   Serio Decl. ¶ 6. Critically, Perles's Proposed Protective Order explicitly frees Petitioners of the use limitations contained in the Florida Confidentiality Order, permitting them to pursue their Contemplated Foreign Litigation. *Id.*

In response to Perles's Proposed Protective Order, Petitioners countered with their own markup of the protective order ("Petitioners' Proposed Protective Order") which, among other things, removed the attorneys' eyes only confidentiality designation that Perles maintains is essential to ensuring that individuals are not subjected to harassment and intimidation.  Ultimately, Petitioners rejected Perles's offer to satisfy the discovery requests by producing the names and last known locations of the Fact Witnesses and the Foreign Attorney, subject to Perles's Proposed Protective Order.  Unable to come to an agreement to narrow the scope of the discovery requests or resolve the matter, Petitioners filed the instant motion on December 23, 2025.

### F.    The Qatari Government's Retaliatory Tactics

The Qatari government has a long and well-documented history of retaliating against litigants who pursue claims alleging its involvement in terrorism financing.  That history is borne out by concrete examples detailing how Petitioners and closely aligned Qatari state actors have used intimidation tactics to counter terrorism-related allegations.

Notably, Perles has recently learned of circumstances strongly indicating that the Qatari government had induced the government of Oman, a fellow Gulf Cooperation Council member, to intimidate and detain Basel Kamal Hashwah, a U.S. national who was a witness and lead plaintiff in a civil action brought in the United Kingdom against Qatar National Bank ("QNB")

and other individuals and entities associated with the Qatari government (*Hashwah & Others v. Qatar Nat'l Bank* & Others [2023] EWHC (KB), Claim No. KB-2023-001144). Perles Decl. ¶ 19.

Per the allegations in the *Hashwah* proceeding, Mr. Hashwah and his company entered into a construction contract in 2014, backed in part by a $3 million USD guarantee check issued by Mr. Hashwah's company, to build a hospital in the Comoros Islands. *Id.* ¶ 20; Serio Decl. Exh. E at 26. But after signing the contract, Mr. Hashwah began to receive threats from individuals potentially associated with the Qatari government urging him to funnel money through QNB and Doha Bank (another Qatari bank closely tied to the Qatari government) to Al Nusra Front terrorists located in Turkey and Syria. Perles Decl. ¶ 21. In response to Mr. Hashwah's refusal to comply with these illicit demands, he was driven out of business in Qatar, his business license was pulled, and the business account of his company was frozen. *Id.* Unbeknownst to Mr. Hashwah, the Qatari government had also convicted him in absentia for the offense of issuing a bad check and sentenced him to three years in prison. *Id.* ¶ 23.

Then, in 2024, when Mr. Hashwah traveled to Muscat, Oman to visit family, he was detained—likely at the Qatari government's direct request—for more than a year. *Id.* ¶ 22. Despite an initial denial of extradition by the Omani courts, Mr. Hashwah was eventually extradited to Qatar in September 2025. *Id.* ¶ 25. As an express condition of Mr. Hashwah's extradition, the Qatari Attorney General issued a written pledge to *not* prosecute Mr. Hashwah for any past or unrelated matters and to limit any legal action strictly to the single offense relating to the "bad check." *Id.* However, upon his arrival in Doha, he was prosecuted on six additional charges—all of which were completely unrelated to this extradition request and have since been dismissed. *Id.* Although these additional charges were dismissed, one of the cases resulted in a civil travel ban

10

that has prevented Mr. Hashwah from leaving Qatar.  *Id.*  To this day, Mr. Hashwah remains under this travel ban and unable to return home to the United States.  *Id.*

Similar allegations have also arisen in other terrorism-financing cases involving Qatari financial institutions.  In a separate litigation in 2019 against Doha Bank (which is also closely tied to the Qatari government), the plaintiffs asserted that they were subjected to surveillance, harassment, attempted bribery, and threats of violence by individuals alleged to be associated with the Qatari government.  *Id.* ¶ 27.  As described in the record, several plaintiffs withdrew from that action citing concerns for their physical safety.  *See id*.  These incidents collectively demonstrate that Petitioners and affiliated state actors possess both the means and the aptitude to employ financial leverage, foreign judicial processes, and intimidation tactics to pressure those who pursue litigation against them.

The risks posed by disclosure are also further compounded by broader, independent dangers.  Petitioners operate within, and maintain ties to, a governmental system that has been publicly linked to designated terrorist organizations and extremist networks, including Hamas, ISIS, and the Al Nusra Front.  *See id.* ¶¶ 28–30.  Individuals, like the Fact Witnesses, the Foreign Attorney, and Perles's Support Personnel who could be seen as adversaries or traitors, risk being exposed to harassment, intimidation, or physical harm by extremist actors wholly outside the control of Petitioners and this Court.  *Id.* ¶¶ 30–33.  Once disclosed, such identifying information cannot be meaningfully contained.

## **ARGUMENT**

## I.    **PERLES IS NOT BARRED FROM RAISING OBJECTIONS TO PETITIONERS' DISCOVERY REQUESTS**

Before addressing the substance of Perles's objections to the discovery requests, Perles must first dispose of Petitioners' erroneous threshold argument that Perles is barred from opposing

the instant motion because doing so would constitute an attempt to relitigate the Section 1782 proceedings. That argument is wrong and should be rejected by this Court. As this Court's Order made clear, Perles is required "to respond to the subpoenas pursuant to the Federal Rules of Civil Procedure and this court's Local Civil Rules," ECF No. 22, pursuant to which it has served its responses and objections and stands ready to provide identity-confirming discovery under an appropriate court-ordered protective order. As the D.C. Circuit made clear, although Petitioners' Application was granted by this Court and affirmed on appeal, Perles retains the right to raise and litigate specific work product objections to the discovery requests. *Qatar Nat'l Bank*, 2025 WL 2945746, at *4.

Critically, the D.C. Circuit's decision addressed only whether the requirements of 28 U.S.C. § 1782 were satisfied and whether this Court abused its discretion in authorizing service of the discovery requests. The court did not hold—and could not have held—that all materials sought by Petitioners are per se discoverable. Indeed, it would have been improper for an appellate court to do so in the abstract. *Cf. Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 108–09 (2009) (recognizing the importance of post-order mechanisms to protect privilege and work product). Any analysis done in the context of determining whether Petitioners were entitled to serve discovery *pursuant to 28 U.S.C. § 1782* is necessarily different than the issues raised in their motion to compel. *See In re Kidd*, 2020 WL 5594122, at *2 (D. Conn. Sept. 18, 2020) (noting that a Section 1782 application is "ancillary by nature, and a ruling on such a motion is procedural and fails to address any substantive issues"); *see also Gov't of Ghana v. ProEnergy Servs., LLC*, 677 F.3d 340, 343 (8th Cir. 2012) ("[Section] 1782 does not establish a standard for discovery. Instead, it provides for a threshold determination of whether to allow foreign litigants to enjoy discovery in U.S. courts in accordance with federal rules . . . . The manner in which discovery proceeds will

be determined by normal discovery rules.").  That is precisely why this Court's Order granting the Application merely directed Perles to "*respond* to the subpoenas"—instead of commanding Perles to produce documents and sit for a deposition by a date certain.  ECF No. 22 (emphasis added).

Furthermore, Petitioners' position fails to account for the fact that changed circumstances and information discovered after a court's grant of a Section 1782 application may affect how that court later determines disputes over the sufficiency of compliance.  As explained herein, the Court issued its decision in February 2025, and nearly a year later, Perles has uncovered new evidence that the risk posed to the Fact Witnesses and Perles's Support Personnel is more dire than Perles previously understood.  *See* Perles Decl. ¶¶ 6–7, 19–30.  It cannot be the case that a respondent under these circumstances would have no recourse to object to an applicant's discovery requests.

Petitioners are not entitled to do an end run on the basic procedures governing discovery disputes merely because they obtained authorization to pursue discovery under Section 1782.  *See In re Application of Auto-Guadeloupe Investissement S.A.*, 2012 WL 4841945, at *4 (S.D.N.Y. Oct. 10, 2012) ("A court considering a request for discovery under § 1782 must also be mindful of U.S. federal discovery procedures under Rules 26 and 45 of the Federal Rules of Civil Procedure."); *see also In re Nagatsuki Ass'n*, 2020 WL 887890, at *2 (N.D. Cal. Feb. 24, 2020) ("Unless the district court orders otherwise, the discovery authorized by the court must be obtained in accordance with the Federal Rules of Civil Procedure.").  This Court should not accept Petitioners' invitation to prematurely curtail its review of Petitioners' irrelevant, unduly burdensome, and duplicative discovery requests.

## II.    PERLES'S SUPPORT PERSONNEL ARE NOT "FACT WITNESSES"

This Court should reject Petitioners' attempt to expand their already broad discovery requests by redefining what it means to be a "fact witness."  In this context, a "fact witness" is an individual that has personal, first-hand knowledge of the Transfer Record's creation or

dissemination—not someone who obtained hearsay information by sitting in as Perles interviewed the Fact Witnesses as part of its efforts to prosecute the Sotloff Action. Accordingly, to the extent that Petitioners seek the identities of individuals other than the Fact Witnesses or the Foreign Attorney, this Court should not force Perles to comply with the Document Subpoena.[6]

Personal knowledge is not simply the receipt or acquisition of information by any means. "For a matter to be considered within a witness's personal knowledge, it must be derived from the exercise of his own senses, not from the reports of others—in other words, it must be founded on personal observation." *Riley v. Univ. of Ala. Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (cleaned up); *see also Dike v. City of Los Angeles*, 2025 WL 2074553, at *2 n.1 (C.D. Cal. May 30, 2025) ("Personal knowledge is '[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said.'") (quoting "KNOWLEDGE," Black's Law Dictionary (12th ed. 2024)); 1 McCormick On Evid. § 10 (Robert P. Mosteller, 9th ed. 2025) (stating that "the requirement [for a witness testifying about a fact] is that the witness have gained knowledge of the fact through her sensory experience") (internal citations omitted). Indeed, courts have held that, because personal knowledge must be "derived from the exercise of [the witness's] own senses," "factual information learned by a [party] only through his or her attorney will not be admitted." *Savoia-Mchugh v. Glass*, 2022 WL 22902653, at *2 (N.D. Fla. May 2, 2022).

Although Petitioners themselves concede that the "touchstone of what makes a witness a 'fact witness' is personal knowledge," ECF No. 27-2 at 13, Petitioners nevertheless demand the disclosure of Perles's Support Personnel, who possess no independent knowledge of, or association

---

[6] Perles does not dispute that the two Fact Witnesses and the Foreign Attorney have personal knowledge of the circumstances surrounding the creation and dissemination of the Transfer Record. Accordingly, Perles has no objection to disclosing the names and last known locations of these individuals, pursuant to Perles's Proposed Protective Order.

with, the circumstances surrounding the creation or dissemination of the Transfer Record.  At most, any information they may have acquired is second-hand and derived from conversations with Perles or through Perles's prosecution of the Sotloff Action.  If it were true that these individuals had "personal knowledge" of the Transfer Record's creation and dissemination, that would mean that any individual, including those currently reading the factual content of this brief, would necessarily also be "fact witnesses" subject to the Petitioners' strained interpretation of their discovery requests.  This position is untenable and should be rejected.

III.   **PETITIONERS' DISCOVERY REQUESTS ARE IRRELEVANT, CUMULATIVE, AND WOULD IMPOSE AN UNDUE BURDEN ON PERLES**

Even assuming that Perles's Support Personnel had personal knowledge about the factual circumstances of the Transfer Record's creation and dissemination sufficient to render them fact witnesses, that does not mean that they are automatically subject to discovery.  This Court must consider, among other things, whether the discovery request is irrelevant, cumulative, and would impose an undue burden on Perles and the innocent individuals in its confidential support network. *See Breiterman v. United States Capitol Police*, 324 F.R.D. 24, 29 (D.D.C. 2018) ("Considerations of both relevance and proportionality govern the scope of discovery allowed under Rule 26.") (cleaned up); *see also id.* at 30 ("[T]he court must limit the extent of discovery that is, *inter alia*, unreasonably cumulative or duplicative, outside the permitted scope of Rule 26(b)(1), or obtainable from another source that is more convenient, less burdensome, or less expensive.").

A.   **Petitioners' Discovery Requests Seek Information that Is Irrelevant to Petitioners' Contemplated Foreign Litigation**

With nothing but speculation in hand, Petitioners first argue that unmasking Perles's Support Personnel is somehow "critical" to pursuing the wrongdoers who allegedly "devised and facilitated the fraudulent scheme to injure [Petitioners'] reputations and business interests." ECF No. 27-2 at 13.  But the fact remains that, unless Petitioners believe that Perles itself participated

in the alleged forgery—which would be an outrageous accusation unsupported by any fact—the Transfer Record's chain of custody necessarily *ended* when Perles received the document from the Foreign Attorney.  At that point, all the individuals who Perles discussed the Transfer Record with would have only acquired information as it was filtered through Perles's prosecution of the Sotloff Action.  Any relevance of this second-hand information is, at best, speculative and cannot support granting Petitioners' motion to compel.

Although Petitioners speculate that Perles's Support Personnel "may, for example, have recollections of what the Syrian Nationals said about the [Transfer Record] that differ from those of the three witnesses Perles offers to identify," ECF No. 27-2 at 15, that hypothetical "rests upon nothing more than an *ipse dixit* (*i.e.*, that there is a factual basis for the statements made based solely upon [Petitioners'] assertions of their existence)."  *Diamond Servs. Mgmt. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 340 (D.D.C. 2021).  "While the standard of relevancy [in discovery] is a liberal one, it is not so liberal as to allow a party to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so."  *US Dominion Inc. v. My Pillow Inc.*, 2024 WL 2880425, at *3 (D.D.C. June 7, 2024) (cleaned up).  Thus, in the absence of any cogent articulation of how these individuals could possibly supply relevant information, the burden and risk to the witnesses outweighs the hypothetical possibility that some additional morsel of information will prove critical to Petitioners' Contemplated Foreign Litigation.  Ultimately, "[a] showing of relevance can be viewed as a showing of need," *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984), and Petitioners have no need for the opinions formulated by Perles's Support Personnel in the context of the Sotloff Action.

Petitioners' arguments are also surprising given that, in their prior briefing, they sought to

convince this Court that there was a tight fit between the information needed to initiate their Contemplated Foreign Litigation and the discovery requested in their Application. Specifically, the Petitioners noted repeatedly that they were interested "*only* in learning who created this forgery and how it came to be provided to [Perles]." ECF No. 15 at 17 (emphasis added); *see also* ECF No. 1 at 9 ("QNB and QC bring this Application to take certain limited discovery of the Perles Firm regarding the identity of the individual or individuals who provided the Forged Record to the Perles Firm."); ECF No. 1 at 24 n.3 ("QNB and QC are trying to obtain the identities of the Anonymous Source and the Forgers solely to initiate judicial proceedings in a foreign tribunal without regard for the past, present, or future litigation strategies of the Perles Firm."). In fact, Petitioners even clarified that they "d[id] not" seek "the identities of all those witnesses whom Respondent interviewed in anticipation of litigation." ECF No. 15 at 17.

Because Petitioners made clear that what they "needed" to pursue their foreign proceeding was information about the Transfer Record's chain of custody and basic identity-confirming discovery of the alleged forgers, they are not entitled to now assert a post-hoc rationalization of relevance that justifies their pursuit of Perles's Support Personnel. Indeed, as the D.C. Circuit noted: "The primary remaining obstacle to filing suit is *knowing whom to sue*, which is precisely why the Petitioners have requested discovery." *Qatar Nat'l Bank*, 2025 WL 2945746, at *3 (emphasis added). But with the identity-confirming information offered by Perles now in reach, Petitioners have a "viable path . . . to advance their litigation plans"—if they would only take Perles's offer. *Id.* Pursuant to an appropriate protective order, this Court should only give Petitioners the identity-confirming discovery (*i.e.*, the names and last known locations of the Fact Witnesses and the Foreign Attorney) that is necessary to initiate their Contemplated Foreign Litigation.

**B.** **Petitioners' Discovery Requests Seek Information that Is Cumulative and Duplicative**

Even if Perles's Support Personnel had relevant information, Perles is not required to produce discovery that is "unreasonably cumulative or duplicative" of the information that Perles has now agreed to produce. Fed. R. Civ. P. 26(b)(2)(C)(i). As Perles has already detailed, because everything that was discussed with Perles's Support Personnel would have been after Perles's receipt of the Transfer Record, Petitioners do not need to uncover the identities of these individuals—as they could obtain the information they seek from Perles or directly from the Fact Witnesses or the Foreign Attorney (who actually have first-hand information of the alleged forgery). *See Sourgoutsis v. United States Capitol Police*, 323 F.R.D. 100, 112–13 (D.D.C. 2017) (holding that the requested discovery "would be contrary to Rule 26's proscription against discovery that is cumulative, duplicative, or available from another source" because it "would duplicate the material the [discovery respondent] already has produced"). Accordingly, nothing would be gained by unmasking these individuals. Unfortunately, Petitioners' arguments once again boil down to their refusal to acknowledge that Perles has already offered them the "critical" discovery required to successfully pursue their foreign proceeding. *See Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999) ("Here, the District Court examined some of the documents, listened to arguments presented by counsel and concluded that unredacted versions of the documents desired would be 'cumulative' and that [the discovery proponent] already 'discovered the gold' but refused to acknowledge it.").

Petitioners attempt to salvage their position by suggesting that even if their requests are cumulative, the Federal Rules only prohibit discovery that is *unreasonably* cumulative. Although Perles acknowledges that there may be instances in which discovery is permissible despite modest overlap in the information requested, that is not the situation presented here. Perles represents that

in its investigatory interviews of the Fact Witnesses at the Paris meeting—although the information provided was not sufficient to authenticate the document or resolve its ambiguities—the information provided by the Fact Witnesses was *consistent* with the allegations set forth in the Sotloff Action.  It is entirely unclear what contradictory information Petitioners believe they could possibly extract from Perles's Support Personnel.

Additionally, this Court should reject Petitioners' argument that, because they "simply seek identifying information of [Perles's Support Personnel]," the request is purportedly "so limited" that this Court should ignore Perles's concerns about the cumulative nature of the requests.  ECF No. 27-2 at 15.[7]  But even if the information sought here were limited in scope or form, this Court should not compel Perles to comply with discovery that would serve no purpose.  *See Sourgoutsis*, 323 F.R.D. at 113 ("The burden that [the discovery respondent] would incur by producing such records, while arguably minimal, outweighs the nonexistent benefit.").

## C.    Petitioners' Discovery Requests Would Place an Undue Burden on Perles by Subjecting Their Support Personnel to a Serious Risk of Harm

Nothing is more important to Perles than protecting the safety of the innocent individuals who courageously assist Perles in pursuing civil actions against those who perpetrate and finance acts of terrorism.  For that reason, Perles has vigorously opposed any effort to unmask these innocent individuals and expose them to the threat of harm.  Few concerns are more serious than the possibility that disclosure of one's identity could expose an individual or their family to risk— be it from a sophisticated criminal network or an individual terrorist sympathizer.  This threat alone, especially as it relates to newly discovered evidence detailing the Qatari government's intimidation

---

[7] Petitioners' citation to *Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347 (D.D.C. 2018), is particularly unavailing given that the discovery requests at issue in that case were *significantly* more limited.  *See id.* at 359 ("Here, however, that concern is heavily mitigated by BuzzFeed's substantial narrowing of its original subpoenas.  What started as a demand for documents and testimony covering nine separate topics is now a request to respond by sworn affidavit to three discrete questions, which likely can be answered with a simple 'yes' or 'no.'  Not a heavy lift.").

tactics, warrants caution before compelling discovery that would require these individuals to relinquish their anonymity solely to facilitate Petitioners' irrelevant and cumulative inquiry.

Here, disclosure of Perles's Support Personnel would present a genuine risk of harm. First and foremost, these individuals could be directly targeted by the Qatari government for assisting Perles with the Sotloff Action. Although Petitioners dismiss Perles's concern as "wild conjecture," ECF No. 27-2 at 16, there is nothing hypothetical about the threats that have already been levied at the Fact Witnesses—and Perles by extension. As Perles has documented, individuals associated with the Sotloff Action have been subjected to surveillance, theft, and threats of violence. Perles Decl. ¶¶ 16–17. Notably, after the Paris meeting attended by Perles and the Fact Witnesses, the Translator's car was broken into and the Translator received WhatsApp messages urging them to drop their support of the Sotloff Action and noting that their life was only "worth a bullet." *Id.* ¶ 17. It is not farfetched to assume that bad actors could similarly turn their attention to Perles's Support Personnel.

The Qatari government's long and well-documented history of supporting and financing terrorist organizations should further give this Court serious pause. *Id.* ¶ 28. For example, when the Qatari government was questioned about its ties to terrorist organizations, state officials remarked that they have a "right to have diplomatic ties with Hamas, the Muslim Brotherhood and other Islamist movements . . . ." Serio Decl. Exh. P. Indeed, the Qatari government has even acknowledged that it provided sanctuary to leaders of Hamas and the Muslim Brotherhood. *Id.*

Although Petitioners insist that they have no relationship to the Qatari government's interests or its history of supporting terrorist organizations, nothing could be farther from the truth. Qatar is an absolute monarchy, and the Emir of Qatar wields nearly all executive, legislative, and judicial authority, running the nation in an autocratic manner. Perles Decl. ¶ 32. Independent

private enterprise is practically nonexistent in Qatar, as the Emir and his inner circle (including the Qatari Royal Family) are able to freely influence entities within Qatar's borders. *Id.* Indeed, the Royal Family holds board of director positions on both QNB's and Qatar Charity's ("QC") boards, and fifty percent of QNB is owned by the Qatari Investment Authority, Qatar's sovereign wealth fund. *Id.* The conclusion that Petitioners are subject to the control and influence of the Qatari government is a well-supported inference. *See, e.g.*, Serio Decl. Exh. Z at 15 (noting that QC "benefit[s] from 'historically close' ties to the Qatari government" and that it "positioned itself to receive government donations to achieve Qatari political objectives").

As detailed above, Perles has also obtained newly discovered evidence suggesting that witnesses in other terrorism-related cases against the Qatari government and key Qatari institutions have been mercilessly targeted for resisting the Qatari government's demands. Specifically, Basel Kamal Hashwah, a U.S. citizen who was the lead plaintiff in a case against QNB and other individuals and entities associated with the Qatari government, has suffered continued injustices allegedly at the hands of the Qatari government. Perles Decl. ¶ 19. As punishment for failing to comply with a terror-finance scheme that involved funneling money to Al Nusra Front terrorists, the Qatari government allegedly targeted Mr. Hashwah and orchestrated the chain of events that led to Mr. Hashwah's being driven out of business in Qatar, having his business license pulled, having his company's business account frozen, and being convicted in absentia for the crime of issuing a bad check. *Id.* ¶¶ 21–23. To make matters worse, on July 27, 2024, while Mr. Hashwah was traveling to see family in Oman, he was detained by Omani authorities. *Id.* ¶ 22. As Mr. Hashwah and his attorney understand it, Mr. Hashwah was not the subject of an Interpol Red Notice nor was he subject to any other form of international alert or travel restriction. Perles Decl.

¶¶ 22–23.  This led Mr. Hashwah to conclude that he had been arrested by the Omani authorities on the basis of a *direct* state-to-state request from the Qatari government.  *Id.*

Mr. Hashwah was then subjected to more than a year of detention in Oman—all while the Qatari government impermissibly and repeatedly sought his extradition to Qatar to answer for trumped up charges related to the very terror-finance scheme that he refused to participate in.  *Id.* ¶¶ 22–25.  Mr. Hashwah, who was recently extradited to Qatar in September 2025 and remains unable to leave the country because of a travel restriction imposed by the Qatari government, provides a chilling reminder of the costs of opposing Qatari interests.  *Id.* ¶ 25.  This ordeal emphasizes that the Qatari government will not hesitate to weaponize the judicial processes of other sovereign nations to intimidate those who would dare speak out against Qatari institutions, including Perles and its Support Personnel.

Petitioners' discovery requests are also particularly worrisome because, as noted, one of Perles's Support Personnel has a background in professional intelligence, and revealing this individual's identity could expose them to an especially significant risk of harm from a multitude of actors.  *Id.* ¶ 15.  Even taking Petitioners at their word that they would never engage in a campaign of harassment or intimidation, the risk posed by the discovery requests still remains. After all, unbeknownst to Petitioners, there may be lone wolf actors in the ranks of Petitioners' sprawling business entities who could exploit opportunities to access this sensitive discovery and target Perles's Support Personnel.  Beyond that, public disclosure of the Support Personnel's identities in a foreign court proceeding could expose them to harm by terrorist actors wholly unrelated to Petitioners.  And mere carelessness could also lead to the publication and exposure of sensitive information.

Where the discovery sought imposes a burden or expense that outweighs its likely benefit, a court may limit otherwise permissible discovery. *See Phillips & Cohen, LLP v. Thorpe*, 300 F.R.D. 16, 18 (D.D.C. 2013). But the balancing test courts apply in these situations is inapplicable here because there is *no meaningful benefit* to Petitioners from the requested discovery to even weigh against the unreasonable and undue burden imposed on Perles's Support Personnel who lack personal knowledge of the Transfer Record's creation and dissemination.

Furthermore, these instances of intimidation and related security concerns, taken together with Petitioners' vast foreign influence and resources, suggest that the entry of Perles's Proposed Protective Order is necessary to mitigate the risk of intimidation, harassment, or other retaliatory measures that could be levied against individuals seen as opposing Petitioners' interests. Petitioners' Proposed Protective Order cannot meet the needs of the serious security concerns at issue here primarily because it does not contain an attorneys' eyes only confidentiality designation. This heightened tier of confidentiality is critical to mitigating foreseeable risks to the individuals subject to disclosure in this case. Moreover, the inclusion of this heightened confidentiality designation does nothing to prevent Petitioners from pursuing their Contemplated Foreign Litigation. Because the disclosure sought here would involve precisely the type of information that, if misused, could subject innocent people to danger and discourage participation in subsequent proceedings, Perles respectfully requests that this Court reject Petitioners' Proposed Protective Order and enter Perles's Proposed Protective Order.[8]

---

[8] This Court should also reject Petitioners' Proposed Protective Order because it attempts to expand the use limitation contained in Perles's Proposed Protective Order to include "Collateral Litigation," which is defined as "[a]ny litigation that may arise from or concern Petitioners' use of Protected Material." Serio Decl. Exh. AI at 1. Petitioners may not expand the use of discovery obtained via this action beyond what they requested in their Application, including to permit Petitioners to ostensibly use confidential material in any unspecified litigation even tangentially related to the "use of Protected Material." Perles also objects to any attempt by Petitioners to use this term to pursue any action—foreign or domestic—against the plaintiffs in the Sotloff Action or Perles (including Perles's Support Personnel).

IV.    **THE MOTION TO COMPEL SHOULD BE DENIED BECAUSE THE FEDERAL RULES PROHIBIT THE DISCLOSURE OF NON-TESTIFYING EXPERTS' IDENTITIES**

Although this Court granted Petitioners' Application and the D.C. Circuit affirmed that threshold ruling, those decisions principally addressed discovery as to *fact witnesses* and did not focus on Perles's right to withhold the identities of Perles's Support Personnel, which reflect counsel's mental impressions, legal theories, and litigation strategy.  Petitioners' Application, on its face, did not seek the identities of the non-testifying experts in Perles's support network; it requested "the identities of individuals with whom You or the Anonymous Source discussed the Purported Transfer Records."  ECF No. 27-2 at 7.  On that limited framing, Perles interprets this Court's ruling as concluding that the discovery requests were permissible insofar as they applied to individuals—beyond the Anonymous Source—who might possess independent personal knowledge concerning the creation or dissemination of the Transfer Record, such as the other Fact Witness (the Translator) and the Foreign Attorney that Perles has now offered to disclose.  This Court did not, however, hold that every category of information encompassed by the discovery requests was discoverable in all circumstances, nor did the D.C. Circuit.  *See supra* Section I.  The Court is now confronted with a different question: whether the discovery requests remain appropriate as propounded where the *only* remaining individuals sought by Petitioners are non-testifying experts with no personal knowledge of the Transfer Record's creation or dissemination.  That question—implicating core work-product protections—presents a distinct legal inquiry that must be evaluated separately from the parties' prior arguments about the applicability of the work product privilege to the identification of the Anonymous Source and the other individuals with personal knowledge of the Transfer Record's creation or dissemination.

Despite Petitioners' suggestion otherwise, the instant motion disregards fundamental limits on discovery imposed by the attorney work-product privilege.  Where, as here, the individuals at

issue are non-testifying expert witnesses retained or consulted solely to assist counsel's evaluation of the record and the development of its litigation strategy, compelled disclosure would reveal counsel's mental impressions. Such disclosure is not merely disfavored by the attorney-work product doctrine, but it is expressly prohibited by the Federal Rules of Civil Procedure. Accordingly, notwithstanding the prior decisions, the identities of Perles's Support Personnel constitute protected attorney work product and are not subject to discovery.

### A.    Perles's Support Personnel Fall Squarely Within the Core of the Attorney Work Product Privilege

Petitioners' motion to compel must be denied because it seeks the discovery of Perles's Support Personnel whose identities constitute opinion work product that is protected by the attorney work-product privilege. This privilege protects materials prepared by or for counsel in anticipation of litigation and guards against discovery that would reveal an attorney's strategic thinking. *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). Federal Rule of Civil Procedure 26(b)(3) codifies this protection, which applies with full force in Section 1782 proceedings, shielding documents and information that would indirectly disclose counsel's mental impressions. *In re Sealed Case*, 676 F.2d 793, 809–10 (D.C. Cir. 1982). Consistent with these principles, courts bar discovery that would expose how counsel structured its investigation or developed litigation strategy, including requests seeking the identities of non-testifying experts or individuals consulted by counsel, because such disclosure would reveal counsel's evaluative judgments and strategic priorities. *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 270 F. Supp. 3d 220, 225 (D.D.C. 2017); *Chiperas v. Rubin*, 1998 WL 531845, at *1 (D.D.C. Aug. 24, 1998).

Here, Petitioners' discovery requests seek information that would necessarily and unavoidably disclose Perles's mental impressions and litigation strategy. Petitioners do not merely seek to identify the individuals from whom Perles obtained the Transfer Record; they demand the

identification of *every* investigator, translator, and consulting expert that Perles strategically engaged to evaluate the Transfer Record and prosecute the Sotloff Action. By requiring the identification of every individual consulted from the moment the Transfer Record was received, Petitioners would effectively reconstruct Perles's investigative process in full, enabling them, at best, to glean information from Perles's Support Personnel and, at worst, to intimidate or interfere with them.

Finally, Petitioners' reliance on *Savignac v. Jones Day*, 586 F. Supp. 3d 16 (D.D.C. 2022), is misplaced as it pertains to the disclosure of Perles's Support Personnel. In *Savignac*, the court ordered disclosure of *fact witnesses* whose testimony was "at the heart of an essential (and contested) element" of the plaintiff's actions: whether the witnesses told the plaintiff that she had a valid claim. *Id.* at 20–21. The discovery requests here, in contrast to *Savignac*, solely target Perles's Support Personnel—none of whom possess independent personal knowledge regarding the Transfer Record. Imagine if the discovery request in *Savignac* sought to identify not just the witnesses with whom the plaintiff spoke, but also every person employed by the plaintiff's counsel, on the speculative theory that they *might* have differing recollections of what the witnesses said. *Cf.* ECF No. 27-2 at 15 (seeking the identities of Perles's Support Personnel because they may "have recollections of what the Syrian Nationals said about the Forged Record that differ from those of the [Syrian Nationals and Foreign Attorney]"). Such a broad intrusion would not have been authorized by the *Savignac* court.

To require the disclosure of every investigator, translator, and consulting expert who assisted Perles in their investigation of the Transfer Record *long after* the document was created and disseminated to Perles would improperly collapse the distinction both this Court and the *Savignac* court carefully drew between fact witnesses central to the issue presented and peripheral

post-dissemination discussions that are not.  Accordingly, because the identities of Perles's Support Personnel constitute opinion work product, and no exceptional circumstances exist to warrant their disclosure, *see infra* Section IV.C, they are protected from disclosure under Rule 26(b)(3).

### B.    The Identities of Non-Testifying Experts Are Specially Protected Work-Product

Not only are the identities of Perles's Support Personnel protected from disclosure under the broad scope of opinion work product recognized by Rule 26(b)(3), *see supra* Section IV.A, but they are also *specially* protected by the distinct privileges concerning non-testifying experts and consultants under Rule 26(b)(4).  Rule 26(b)(4) protects from disclosure the identity of experts informally consulted in preparation for trial but not retained.  *See* Fed. R. Civ. P. 26(b)(4) (advisory committee's note to 1970 amendment).  And courts have long held that the identities of experts retained or specially employed in anticipation of litigation but not expected to be used at trial are protected from disclosure as well, absent exceptional circumstances.  *See Ager v. Jane C. Stormont Hosp. and Training Sch. for Nurses*, 622 F.2d 496, 503 (10th Cir. 1980) (holding that both the identity and opinions of non-testifying experts are protected absent a showing of "exceptional circumstances"); 8A Wright & Miller's Federal Practice & Procedure § 2032 (3d ed. 2025) ("Since 1980, the Tenth Circuit's approach [in *Ager*] has become predominant among courts."); *Strobl v. Werner Enters., Inc.*, 577 F. Supp. 3d 960, 968 (S.D. Iowa 2022) ("Courts . . . have held that an opposing party must establish 'exceptional circumstances' before it is entitled even to learn the identity of a consulting expert.").

Here, because Perles's Support Personnel were not retained as testifying experts in the Sotloff Action—in part because Perles wanted to protect the anonymity and safety of these individuals—they fall into the category of: (i) experts retained or specially employed in anticipation of litigation or preparation for trial but not expected to be used at trial; or (ii) experts

informally consulted in preparation for trial but not retained. As such, absent a showing of "exceptional circumstances"—which are not applicable here, *see infra* Section IV.C—their identities are not subject to disclosure.

### C.    No Exceptional Circumstances Warrant Disclosure of Non-Testifying Experts' Identities

The materials at issue constitute opinion work product and non-testifying expert work product—both of which trigger a heightened level of protection. In order to overcome the protections afforded to this work product, courts require a showing of exceptional circumstances "under which it is impracticable for [them] to obtain facts or opinions on the same subject by other means." *Doe v. District of Columbia*, 231 F.R.D. 27, 41 (D.D.C. 2005) (holding that the defendant was not entitled to depose the plaintiff's expert because the defendant "failed to show the 'exceptional circumstances' necessary to depose a non-testifying, consulting expert"). When seeking discovery of a non-testifying expert, it is not enough to claim ignorance specifically of what that expert knows—the party must show it has no other way to access any information or facts on the subject. *See Marine Petroleum Co. v. Champlin Petroleum Co.*, 641 F.2d 984, 996–97 (D.C. Cir. 1979) (holding that the discovery proponent's "burden is to show circumstances such that he cannot get any facts or opinions on the subject in which he is interested").

Despite more than a year having elapsed since Petitioners first filed their Application, Petitioners have entirely failed to identify any persuasive justification or circumstance exceptional enough to warrant the disclosure of the identities of Perles's Support Personnel. Nor could they. The information Petitioners claim to seek regarding the creation and dissemination of the Transfer Record is fully obtainable from the Fact Witnesses and the Foreign Attorney, who were part of the

Transfer Record's chain of custody and have firsthand knowledge of those events.[9]  *See Diamond Servs.*, 339 F.R.D. at 339 ("Where potentially important legal rights are implicated by a subpoena and alternative sources are more convenient or less burdensome, those alternatives should be explored first.") (cleaned up).

Petitioners' own briefing underscores the speculative nature of their request.  Petitioners acknowledge that "to the extent that any future discovery request inquires into the substance of conversations that these [Non-Fact] Witnesses had with Perles, there might be 'specific work product objections' that the Court might need to resolve . . . but that remains entirely hypothetical at this point."  ECF No. 27-2 at 14.  But this issue is not hypothetical.  The entirety of the knowledge contained within the network of Perles's Support Personnel derives exclusively from their engagement by Perles in anticipation of litigation and from privileged communications with Perles as part of this engagement.  Petitioners' willingness to defer the question of whether any non-privileged information could actually be obtained until *after* the identities are disclosed puts the cart before the horse.  Requesting the identities of these individuals while conceding that their knowledge may be wholly privileged underscores the true aim of the Petitioners' request—not to obtain admissible factual information, but to expose Perles's protected investigative structure without any demonstrated basis to believe that disclosure would yield non-privileged material useful to their Contemplated Foreign Litigation.  Because Petitioners can obtain the relevant information through ordinary discovery or other investigative methods directed at the Fact

---

[9] Should this Court seek to validate the authenticity of this assertion, Perles is willing to provide the Court with declarations from any such individuals for in camera review, testifying to the extent of their knowledge.

Witnesses and the Foreign Attorney, they cannot demonstrate the need, much less the exceptional circumstances, required to justify the intrusion.[10]

## V.    THIS COURT SHOULD DEFER ITS CONSIDERATION OF PETITIONERS' MOTION UNTIL THE SUPREME COURT HAS RESOLVED PERLES'S PENDING PETITION FOR A WRIT OF CERTIORARI

Perles also advises this Court that it recently filed a petition for a writ of certiorari with the United States Supreme Court on January 15, 2025, seeking further review of the D.C. Circuit's decision affirming the grant of Petitioners' Application. Perles respectfully requests that this Court refrain from ruling on the instant motion or, in the alternative, defer Perles's obligation to comply with the Document Subpoena, if any, until the United States Supreme Court has resolved the petition. Perles intends to meet and confer with Petitioners and, if necessary, file a formal motion for stay by February 3, 2025 (the deadline for Petitioners' reply brief on the instant motion).

The principal question at issue in Perles's petition is whether a district court may grant an application under 28 U.S.C. § 1782 when it would amount to a modification of a binding protective order issued by a federal district court in another circuit, an issue as to which there is a circuit split.

Deferral of the instant motion will serve this Court's interest in preserving judicial economy and will spare Perles's from the possibility of needing to comply with a Document Subpoena that could ultimately be vitiated on appeal. Accordingly, Perles respectfully requests that this Court refrain from ruling on the instant motion until the United States Supreme Court has ruled on Perles's petition.

---

[10] Even assuming, arguendo, that some portion of the requested materials could be characterized as fact work product, Petitioners still fail to satisfy Rule 26(b)(3)'s requirements. Rule 26 does not permit an adversary to pierce the work product privilege merely because it might provide a more convenient or strategically advantageous path to discovery.

## <u>CONCLUSION</u>

For the foregoing reasons, Perles respectfully requests that this Court deny Petitioners' Motion to Compel, insofar as it seeks the identities of Perles's Support Personnel.  With respect to the disclosure of the names and last known locations of the Fact Witnesses and the Foreign Attorney, Perles respectfully requests that any disclosure be made subject to the entry of Perles's Proposed Protective Order.[11]

Dated: January 20, 2026

<div style="margin-left: 50%;">

*/s/ Robert F. Serio*

Robert L. Weigel
Robert F. Serio
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave, 47th Floor
New York, NY 10166
(212) 351-4000
rweigel@gibsondunn.com
rserio@gibsondunn.com

*Counsel for Perles Law Firm, P.C.*

</div>

---

[11] Should this Court find that the identities of Perles's Support Personnel are subject to disclosure, Perles respectfully requests that the identities of these individuals be subject to a highly confidential attorneys' eyes only designation, as detailed in Perles's Proposed Protective Order.  This heightened confidentiality designation is warranted not only because the identities of these individuals constitute core work product, but also because one of these individuals' background in professional intelligence makes them especially susceptible to intimidation.

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, I served a copy of the foregoing motion on all counsel of record via this Court's CM/ECF system.


Dated:  January 20, 2026                         */s/ Robert F. Serio*
                                                  Robert F. Serio
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  200 Park Ave, 47th Floor
                                                  New York, NY 10166
                                                  (212) 351-4000
                                                  rserio@gibsondunn.com