IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF QATAR NATIONAL BANK (Q.P.S.C.) AND QATAR CHARITY FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | No. 1:24−mc−00035−LLA |

### DECLARATION OF STEVEN PERLES IN OPPOSITION TO PETITIONERS' MOTION TO COMPEL

I, Steven Perles, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

1. I submit this Declaration in the above-captioned matter in opposition to Petitioners Qatar National Bank (Q.P.S.C.) ("QNB") and Qatar Charity's ("QC") ("Petitioners") Motion to Compel, ECF 27, pursuant to Federal Rule of Civil Procedure 45.

2. The facts set forth in this Declaration are based on my personal knowledge or information provided to me in connection with my work on behalf of Defendant The Perles Law Firm, P.C. ("Perles").

3. I am the Senior Attorney and Founder of The Perles Law Firm, P.C., located in Washington, D.C., which specializes in civil anti-terrorism litigation, suing state sponsors of terrorism as well as corporations and financial institutions that contribute material support to acts of international terrorism.

4. I, along with my colleagues at Perles, brought a federal Anti-Terrorism Act lawsuit against QNB and QC, on behalf of the family of Steven Sotloff, in the United States District Court for the Southern District of Florida in the case captioned *Sotloff v. Qatar Charity, et al.*, No. 22-cv-80726 (S.D. Fla.) (Middlebrooks, J.) (the "Sotloff Action"). As has been widely reported, in

1

2013, Steven Sotloff, a well-respected Israeli-American journalist, was working in Syria documenting the Arab Spring independence movement and the broader conflicts in the Middle East. *See* Exhibit A to the Declaration of Robert F. Serio, dated January 20, 2026 ("Serio Decl."). In 2011, a civil war had begun in Syria, with combat in the following years involving numerous state and non-state groups, including the notorious terrorist organization the Islamic State of Iraq and Syria ("ISIS"). Serio Decl. Exh. B. On August 4, 2013, Sotloff was taken hostage by ISIS, and over the course of the next year, Sotloff was held captive, tortured, and, on August 31, 2014, tragically and publicly beheaded. Serio Decl. Exh. A.

5.In connection with Perles's representation of the plaintiffs in the Sotloff Action, Perles was provided with a bank transfer record (the "Transfer Record") that allegedly documented a transaction at Ziraat Bank in the Republic of Turkey in which QNB and QC provided $800,000 in financing to Fadhel al Salim, a known Daesh (*i.e.*, ISIS) terrorist.

6.Perles had received the Transfer Record through an attorney at a transnational law firm (the "Foreign Attorney") who had introduced Perles to two Syrian nationals who claimed to have knowledge concerning the provenance and dissemination of the Transfer Record (the "Fact Witnesses").

7.Pursuant to the Confidentiality Order entered in the Sotloff Action (the "Florida Confidentiality Order"), *see* Serio Decl. Exh. C, the unredacted Transfer Record was produced on June 26, 2023 by courier to the designated outside counsel of record for QNB and QC in the Sotloff Action with the designation "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

8.Thus far, disclosure of the unredacted Transfer Record has been limited to designated outside counsel of record in the Sotloff Action, including Douglas Hallward-Driemeier and Michael G. McGovern from the law firm Ropes & Gray LLP, and John Hillebrecht, Kevin

Walsh, Jessica A. Masella, and Michael G. Lewis from the law firm DLA Piper LLP, who are also counsel to QNB and QC in the instant § 1782 proceedings (the "Action"). Notably, this designation has meant that the in-house personnel for QNB and QC have been prohibited from reviewing the information contained in the unredacted version of the Transfer Record.

9. A redacted version of the Transfer Record was also produced in the Sotloff Action and was attached as an exhibit to the Declaration of Douglas Hallward-Driemeier, filed by QNB and QC in support of this Action. *See* ECF 1-8. Perles redacted the names, signatures, and biometric data found on the document in an effort to protect the identities and safety of those individuals who were alleged witnesses to the transaction.

10. Following the entry of the Florida Confidentiality Order and the subsequent disclosure of the Transfer Record to counsel for QNB and QC, counsel stated that they believed the Transfer Record to contain indicia of forgery, including typographical errors found on the face of the document.[1] The Sotloffs, through Perles, engaged in an extensive effort to verify the Transfer Record's authenticity in light of this information, including by consulting experts and meeting with the Fact Witnesses in Paris, France in August of 2023. Ultimately, the information provided by the Fact Witnesses in these investigatory interviews was consistent with the allegations set forth in the Sotloff Action. Nevertheless, despite these efforts, the Sotloffs could not be certain that they would be able to authenticate the document at trial. Accordingly, on September 22, 2023, the parties agreed to a voluntary dismissal of the Sotloff Action with prejudice. Serio Decl. Exh. D.

---

[1] Prior to the disclosure of the Transfer Record to counsel for QNB and QC, Perles was not aware of any inconsistencies on the face of the document that would cast doubt on its authenticity. Unfortunately, the pre-complaint translation of the Transfer Record was provided to Perles by the Foreign Attorney; and the Foreign Attorney's translators appear to have inadvertently corrected the typographical errors in the document. Additionally, Perles's efforts to have the Transfer Record translated via machine and human translation also did not result in these inconsistencies being brought to Perles's attention.

11. The reality is that the exact circumstances of this document's creation are unknown—and may never be known. Nevertheless, I can state without reservation my belief that dissemination of the highly sensitive information sought here by QNB and QC would inflict an irreparable injury onto Perles by risking the safety of a number of people, including those serving as consulting experts, investigators, translators, and/or staff (the "Non-Fact Witnesses") who have no independent knowledge concerning the provenance or dissemination of the Transfer Record, and jeopardizing Perles's ability to continue its practice, which depends on the cooperation and expertise of the aforementioned individuals.

12. Despite Perles's genuine concerns that the disclosure of information concerning the Fact Witnesses poses a serious safety risk to those individuals and their families, Perles is willing produce information sufficient to identify the names and last known locations of the Foreign Attorney and Fact Witnesses pursuant to a protective order, as proposed by Perles to counsel for QNB and QC ("Perles's Proposed Protective Order"). Serio Decl. Exh. AG.

13. To that end, Perles's Proposed Protective Order: (i) limits the use of information containing confidential information under the Florida Confidentiality Order ("Florida Protected Material") solely to the investigation and litigation of the Action and the contemplated foreign proceeding described in QNB and QC's Application to Take Discovery Pursuant to 28 U.S.C. § 1782 (the "Contemplated Litigation"); (ii) prohibits disclosure of Florida Protected Material to anyone other than the outside counsels of record for the parties in those proceedings, as well as to the respective courts and their personnel responsible for adjudicating those proceedings and/or to the appropriate law enforcement or prosecutorial entities in such Contemplated Litigation; and (iii) requires that, if Florida Protected Material is provided to any court, tribunal, judicial body, or law enforcement or prosecutorial entity, Petitioners must take all reasonable measures to maintain the

maximum possible confidentiality afforded under that jurisdiction's laws.

14. Perles maintains, however, that the identities of the Non-Fact Witnesses with whom Perles discussed the Transfer Record constitute core work product that cannot be disclosed under the present circumstances. These individuals have no information about the provenance of the Transfer Record—as they were not involved in the creation or dissemination of this document.[2] Accordingly, I believe disclosing these individuals' identities would only serve to invade Perles's attorney work product, threaten Perles's ability to pursue further anti-terrorism litigations, and endanger the safety of innocent people.

15. Should this Court find that the identities of the Non-Fact Witnesses are not shielded from disclosure under the work product doctrine, Perles respectfully requests that the identities of these individuals be subject to a highly confidential attorneys' eyes only designation, as detailed in Perles's Proposed Protective Order. This heightened designation is warranted not only because the identities of these individuals constitute core work product, but also because one or more of these individuals have backgrounds in professional intelligence, which makes them especially susceptible to intimidation and threats.

16. To be clear, I strongly believe that the safety concerns at issue here are legitimate and worthy of this Court's attention. I have had personal experience dealing with threats as they relate to the Sotloff Action and other lawsuits seeking redress for victims of terror. As mentioned above, in August of 2023, I met with the two Fact Witnesses, one of whom acted as an informal

---

[2] Perles later had discussions concerning the Transfer Record with two to three attorneys from the law firm Fleischman Bonner & Rocco LLP who were considered as potential co-counsel in the Sotloff Action. Ultimately, for reasons having nothing to do with the provenance and seeming veracity of the Transfer Record at that time, the other attorneys did not join Perles as co-counsel in light of their other existing time commitments. Additionally, Perles spoke to three to five prosecutors in the U.S. Attorney's Office for the Eastern District of Virginia about whether they were pursuing charges against al Salim.

translator (the "Translator") at a law office in Paris, France.[3]  The Translator reported to French police that, after this meeting, the Translator's car was broken into; various evidentiary materials were removed; and a handwritten note in Arabic was left behind which, when translated, read: "This is a warning."[4]

17.  The Translator also reported receiving a series of threats via audio message on WhatsApp.[5]  The messages specifically mentioned the Sotloff Action and warned that the Translator was being surveilled.  The messages urged the Translator to "shut [their] mouth" about the case—even offering the Translator money to just "forget about the subject."  The messages then went on to threaten the life of the Translator and the Translator's family, noting that they could be "reach[ed]" wherever they were.  The Translator was also told that he was only "worth a bullet."  The messages also became increasingly graphic—with one message asking how it felt to "side with the family of a stinking American Jewish Pig against a Muslim country?"

18.  Based on the aforementioned instances of intimidation and harassment, I worry that that the criminal actors who have clearly taken an interest in the Sotloff Action may carry through on their threats and target anyone who could be seen as having assisted in Perles's representation of the Sotloffs.  This is precisely why I ask that this Court adopt Perles's Proposed Protective Order and protect the identities of the Fact Witnesses and Non-Fact Witnesses under a highly confidential attorneys' eyes only designation.

---

[3] The Translator that attended this Paris meeting has no professional affiliation with Perles and was never retained by Perles to provide translation services.  Accordingly, the Translator is not a Non-Fact Witness.

[4] Attached to this Declaration as Exhibit A is a true and correct copy of the original police report, as well as a certified English translation, that was filed by the Translator with French law enforcement authorities on August 8, 2023. Sensitive and/or identifying information regarding the Fact Witnesses has been redacted from the original and translated versions of this document.  Also attached to this Declaration as Exhibit B is a true and correct compilation of photographs taken in Paris, France, following the break-in of the Translator's vehicle.

[5] Attached to this Declaration as Exhibit C is a true and correct copy of a transcript and translation prepared by Perles, which transcribes an audio file documenting the threats received by the Translator.  Sensitive and/or identifying information regarding the Fact Witnesses has been redacted from the original and translated versions of this document.

19. The importance of adopting Perles's Proposed Protective Order is also further underscored by my discovery of new information (unavailable at the time of Perles's opposition to the § 1782 Application) that bears directly on the Qatari government's efforts to target and silence its critics. I recently learned of circumstances strongly indicating that the Qatari government had induced the government of Oman, a fellow Gulf Cooperation Council member, to intimidate and detain Basel Kamal Hashwah, a U.S. national who was a witness and lead plaintiff in a civil action brought in the United Kingdom against QNB and other individuals and entities associated with the Qatari government (*Hashwah & Others v. Qatar National Bank & Others* [2023] EWHC (KB), Claim No. KB-2023-001144). Serio Decl. Exh. E. Similar to the Sotloff Action, Mr. Hashwah alleged that prominent individuals and entities associated with the Qatari government participated in a scheme to fund a designated jihadist terrorist group in Syria. *Id.* at 1–4.

20. The alleged scheme described in the Hashwah complaint is as follows. In 2014, Mr. Hashwah and his company American Titan entered into a construction contract with the Jassim and Hamad Bin Jassim Charitable Foundation ("Charitable Foundation"), a Qatari entity, to build a hospital in the Comoros Islands. *Id.* at 3, 26. In connection with this project, Mr. Hashwah entered into a joint venture agreement with a company owned by Christian Comair, another defendant named in Mr. Hashwah's action, which included an obligation by Mr. Comair to put a performance bond valued at $3 million USD and for American Titan to provide a guarantee check to the same value to be issued by QNB. *Id.* at 10, 26. Because of the structure of this transaction, the QNB check could be presented for payment by Mr. Comair at any time, leaving Mr. Hashwah open to the risk of sanctions and imprisonment in Qatar for the crime of writing a bad check if he did not have sufficient funds available. *Id.* at 26.

21. Once Mr. Hashwah had signed the contract, he began to receive threats from individuals and entities potentially associated with the Qatari government demanding that he help to fund a terrorist group called the Al Nusra Front. *Id.* at 27–28. Unless he agreed to funnel money through QNB and Doha Bank (another Qatari bank closely tied to the Qatari government) to Al Nusra Front terrorists located in Turkey and Syria, the contract would not be performed. *Id.* at 2, 27, 39–40. Mr. Hashwah, however, refused to comply with this terror finance scheme. *Id.* at 27. In response to Mr. Hashwah's refusal to comply, the performance bond and Mr. Hashwah's guarantee were immediately called by QNB. *Id*. Mr. Hashwah was subsequently driven out of business in Qatar, his business license was pulled, and the business account of American Titan was frozen. *Id.* at 27, 38.

22. On July 27, 2024, Mr. Hashwah, a United States citizen, traveled to Muscat, Oman to visit his brother. Serio Decl. Exh. F at 6. Upon landing at Muscat International Airport, he was immediately apprehended by Omani authorities who notified him that he was being sent to Interpol's offices, *id.*, seemingly in retaliation for the civil proceedings initiated by Mr. Hashwah in the United Kingdom. Omani officials told Mr. Hashwah that they did not know the precise reason why he was being detained but that it was connected to a request from the Qatari government. *Id*. Omani authorities seized Mr. Hashwah's passport and placed him under house arrest pending an Omani court's ruling on Qatar's extradition request. *Id.* at 6–7.

23. On September 12, 2024, after weeks of house arrest and little progress being made on his case, Mr. Hashwah's attorney reached out to Interpol in Oman and confirmed that Mr. Hashwah had been detained on the basis of a Qatari judgment involving a "bad check." *Id.* Unbeknownst to Mr. Hashwah, back in 2018, the Qatari government had issued a warrant for his arrest. Serio Decl. Exh. G at 2. The arrest warrant stemmed from a judgment, secured against Mr.

Hashwah in 2016, in which the Qatari government convicted him in absentia for the offense of issuing a bad check and sentenced him to three years in prison. *Id.* As Mr. Hashwah and his attorney understand it, Mr. Hashwah was not the subject of an Interpol Red Notice[6] nor is he subject to any other form of international alert or travel restriction. Serio Decl. Exh. F at 7. This led Mr. Hashwah to conclude that he had been arrested by the Omani authorities on the basis of a *direct* state-to-state request from the Qatari government. *Id.*

24. On November 17, 2024, the Muscat Court of Appeal rejected Qatar's extradition request in a written decision. *See* Serio Decl. Exh. G. Despite the court's ruling, a letter sent by Mr. Hashwah's attorney to the U.S. Embassy stated that Mr. Hashwah has not had his passport returned and that he was being impermissibly detained in Oman. Serio Decl. Exh. H at 1. Mr. Hashwah's detention was in direct contravention of Omani law, which limits the period of provisional detention to no more than two months. *Id.* at 2. And although the court's decision is final and not subject to appeal, the prosecuting authority in Oman has sought to retry the case, again in contravention of Omani law. *Id.* at 1–2.

25. After more than a year of detention in Oman, the Muscat Court of Appeal extradited Mr. Hashwah back to Qatar in September 2025. Serio Decl. Exh. I. As an express condition of Mr. Hashwah's extradition, the Qatari Attorney General issued a written pledge to not prosecute Mr. Hashwah for any past or unrelated matters and to limit any legal action strictly to the single offense relating to the "bad check." *Id.* at 2. However, upon his arrival in Doha, he was prosecuted on six additional charges—all of which were completely unrelated to this extradition request and have since been dismissed. *Id.* Although these additional charges were dismissed, one of the cases

---

[6] An Interpol Red Notice is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action. The Red Notice is based on an arrest warrant or court order issued by the judicial authorities in the requesting country.

resulted in a civil travel ban that has prevented Mr. Hashwah from leaving Qatar. *Id.* To date, Mr. Hashwah remains under this travel ban and unable to return home to the United States. *Id.*

26. Given the close relationship between the governments of Qatar and Oman, it is reasonable to infer that Mr. Hashwah's prior detention in Oman had been induced by Qatar to intimidate Mr. Hashwah and derail the legal proceedings in the United Kingdom. This incident—as well as Mr. Hashwah's inability to leave Qatar—provides further evidence that the Qatari government has considerable resources and connections and will not hesitate to weaponize the judicial processes of other sovereign nations to intimidate those who would dare speak out against Qatari institutions like QNB and QC.

27. In a separate matter, allegations closely resembling those in the instant case were brought against another major Qatari financial institution, Doha Bank. Serio Decl. Exh. J. According to news reports, eight Syrian refugees sued Doha Bank, alleging that it "knowingly facilitated the transfer of funds to al-Nusra Front, a jihadist group that controlled part of northern Syria." *Id*. at 1. Counsel for four of the eight refugee claimants argued before a court in the United Kingdom that agents of the Qatari government were involved in an intimidation campaign. Serio Decl. Exh. K at 1. The state officials allegedly covertly surveilled the refugees; harassed and intimidated them; attempted to bribe them; and threatened visits by armed, masked men under the cover of night. *Id*. These retaliatory efforts were unfortunately successful—as half of the original claimants withdrew from the action because they feared for their physical safety. *Id*. at 2. A spokesperson for Doha Bank conceded the bank "ha[d] a connection to the Qatari state and ruling family" but disclaimed any close links between the Qatari Royal Family and Doha Bank.[7] Serio

---

[7] Qatar Investment Authority (Qatar's sovereign wealth fund) is the largest shareholder for both Doha Bank and QNB. Serio Decl. Exh. L at 3; Serio Decl. Exh. M at 75.

Decl. Exh. J at 2. Although the lower court ruled against the remaining four claimants, these claimants were granted the right to file an appeal to the civil appellate court, which remains pending. *See* Serio Decl. Exh. N.

28. These acts by the Qatari government should not come as a surprise. The Qatari government has a long and well-documented history of supporting and financing terrorist organizations. *See, e.g.*, Serio Decl. Exh. O. Indeed, the Qatari government has even acknowledged that it provided sanctuary to leaders of Hamas and the Muslim Brotherhood. Serio Decl. Exh. P at 2. When the Qatari government was questioned about its ties to terrorist organizations, senior state officials remarked that they have a "right to have diplomatic ties with Hamas, the Muslim Brotherhood and other Islamist movements . . . ." *Id*. at 3. Recently, the Qatari government has also faced increasing pressure from the United States to expel Hamas officials who had taken refuge in Qatar and opened an office in the nation's capital. Serio Decl. Exh. Q at 2.

29. Perles and the aforementioned Syrian refugees in the Doha Bank case are not the first to accuse the Qatari government of having ties specifically to the Al Nusra Front. Since 2012, there have been public reports of Qatar aiding the Al Nusra Front (*e.g.*, furnishing it with financial assistance and coordinating between Al Nusra Front officials and Qatari military commanders). *See id.*; Serio Decl. Exh. R at 1. Indeed, in 2017, the former Qatari Prime Minister and then-Foreign Minister noted that Qatar may have possibly had ties to the Al Nusra Front. Serio Decl. Exh. S at 1–2.

30. These concerns about the Qatari government's ties to terrorist organizations apply in equal force to the private institutions and industries who collaborate closely with the Qatari government. As early as 2003, the U.S. Congress was warned that Qatari-based charities were

helping to move and launder money linked to al Qaeda, providing employment and documentation for key figures in the operation. *See* Serio Decl. Exh. T. In 2023, the United States Treasury Department even targeted for sanctions a Qatar-based financial facilitator with close ties to a Hamas commander. Serio Decl. Exh. U at 1.

31. In January of 2023, the United Kingdom also fined a major Qatari bank, Al Rayan Bank PLC, in late 2023 for failing to put in place adequate controls to prevent financial crime; a senior British official stated that "Al Rayan failed to manage the risk that it might be used to facilitate money-laundering." Serio Decl. Exh. V at 1. Al Rayan Bank is directly and indirectly controlled by the Qatari government and affiliated institutions. *See* Serio Decl. Exh. W. The credit rating agency, Moody's, assumes "very high government support" for Al Rayan—support strong enough to bolster the bank's credit rating. *Id*. at 7.

32. The Qatari government's interests and actions should be imputed to the QNB and QC. Qatar is a hereditary monarchy, wherein the Emir of Qatar, Sheikh Tamim bin Hamad al-Thani, holds nearly all executive, legislative, and judicial authority and runs the country in an autocratic manner. Serio Decl. Exh. X at 970. Because the Emir and his inner circle (including the Qatari Royal Family) have the ability to influence entities within Qatar's borders, many private enterprises must maintain a close relationship with the government. *See, e.g.*, Serio Decl. Exh. Y at 1 (noting that QNB's strong issuer default rating reflects its "close links to the government"); Serio Decl. Exh. Z at 15 (noting that QC "benefited from 'historically close' ties to the Qatari government[] and [that] the Charity positioned itself to receive government donations to achieve Qatari political objectives"). Indeed, fifty percent of QNB is owned by the Qatari Investment Authority, Qatar's sovereign wealth fund. Serio Decl. Exh. AA at 1. Members of the Qatari Royal Family sit on the boards of both QNB and QC. Serio Decl. Exh. AB; Serio Decl. Exh. AC.

Accordingly, it is reasonable to infer that QNB and QC are subject to the control and influence of the Qatari government.

33. Revealing the identities of the Fact Witnesses poses significant dangers for several reasons. Members of ISIS and its affiliates, such as the Al Nusra Front, hold high-ranking positions beyond Qatar's borders. *See, e.g.*, Serio Decl. Exh. AD. For instance, earlier this year, Ahmad al-Sharaa became the President of Syria. *Id.* at 2. Formerly known by his *nom de guerre*, Abu Mohammad al-Jolani, al-Sharaa was a key figure in the formation and rise of the Al Nusra Front, working under ISIS leadership to establish the group in Syria. Serio Decl. Exh. AE at 2. Although al-Sharaa may no longer be a leader of the Al Nusra Front, his loyalties to various terrorist organizations remain uncertain. It is also possible that other Syrian government leaders maintain ties to these terrorist organizations, leveraging their newfound official positions and resources to target those who oppose them. These factors underscore the potential risks posed to the Fact Witnesses here—as they are both Syrian nationals who could be seen as "traitors" to the current regime.

34. Furthermore, ISIS-inspired attacks organized by terrorist sympathizers have occurred all over the globe. Although many of these attacks have been committed by unsophisticated actors, they still pose a serious threat to the innocent individuals caught in their crosshairs.

35. If I have learned anything from litigating the Sotloff Action it is that bad actors with terrorist sympathies will stop at nothing to intimidate, harass, and threaten innocent people into submission. Accordingly, I respectfully urge this Court to deny Petitioners' Motion to Compel.

Executed this 20th day of January 2026 in Washington, D.C.

                                                                                          _____
                                                                                          Steven Perles